# Cuthbertson's Appeal.
# Appeal of the Contributors to the Pennsylvania Hospital.
# Appeal of the Zoological Society.

1. Where an alleged testator is shown by evidence to be weak in mind, whether arising from age, bodily infirmity, great sorrow, or other cause tending to produce such weakness, though not sufficient to create testamentary incapacity, and the person whose advice has been sought and taken, receives a large benefit under the instrument propounded as a will, it must be shown affirmatively that the alleged testator had full understanding of the nature of the disposition contained in it.

2. Frew *v.* Clarke, 30 P. F. Smith 170, distinguished; Boyd *v.* Boyd. 16 Id. 283, followed.

3. Every man who draws a will under such circumstances as those specified above, is required to prove affirmatively, all the circumstances connected with the drawing of the will, and must make it appear that the alleged testator was laboring under no mistaken apprehension as to the value of his property, and the amount he was giving to his confidential adviser.

4. What evidence as to the existence of such circumstances as those mentioned, should move the court to award an issue *devisavit vel non* to test the validity of the testamentary instrument propounded.

| 97 | 163 |
| 162 | 568 |
| 97 | 163 |
| 185 | 69 |
| 185 | 71 |
| 185 | 442 |
| 97 | 163 |
| 139 | 340 |
| 97 | 163 |
| 192 | 267 |
| 97 | 163 |
| 193 | 611 |
| 97 | 163 |
| 195 | 289 |
| 97 | 163 |
| 203 | 417 |
| p203 | 418 |
| 97 | 163 |
| e208 | 425 |
| 97 | 163 |
| 212 | 516 |

[Cuthbertson's Appeal.]

February 3d 1881.    Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ.

Appeals from a decree of the Orphans' Court of *Philadelphia county ;* Of January Term 1880, No. 228.

Appeals of James Cuthbertson, James Georgeson and Agnes, his wife, in right of said Agnes, Jeanie Cuthbertson, the Contributors to the Pennsylvania Hospital and the Zoological Society of Philadelphia, from a decree of the court refusing to grant an issue *devisavit vel non,* to determine whether a certain paper, purporting to be a codicil to the last will and testament of one John L. Neill, was a valid codicil or not, and dismissing an appeal from the decision of the Register of Wills admitting said codicil to probate.    The facts of the case, as they appeared from the evidence taken before Joseph De F. Junkin, Esq., the examiner appointed by the court, were as follows :

John L. Neill, the testator, was born in Leith, Scotland, somewhere about the year 1806.    In 1828 he arrived in this country, and about 1838 began a large and lucrative business in shipbuilding, from which he amassed a large fortune.    In 1867 he retired from business, but remained still actively engaged in taking care of the various property in which his means were invested. He was in all his dealings a man of strong mind and resolute will.

He lost from time to time all his children, brothers and sisters, and in the year 1876 was living in his residence, in Philadelphia, with his wife, Elizabeth Ann Lambert, his wife's sister, and Mary Ann Maloney, his wife's cousin.    He was at this period, and had for some time before, been on intimate terms with a family named Cuthbertson living in Scotland, who were no relation to him, but to whom he was under obligations.    One of this family, by name William Cuthbertson, was in the year 1876 temporarily living with him.

On April 28th 1874, Neil, being then indisputably of sound testamentary capacity, himself wrote and signed his will.    By the terms of this instrument he directed that his wife, Miss Lambert and Miss Maloney, should be allowed the use of testator's residence during the said wife's life.    He also further directed that sufficient of his property should be invested in good securities, so as to yield the annual sum of $11,000, of which sum he directed $8000 to be paid annually to his wife for life, $2000 to be paid annually to Miss Lambert, and $1000 annually to Miss Maloney.    After his wife's death, testator directed that during Miss Lambert's life she should still be allowed the use of the house with Miss Maloney, receiving $8000 in place of the former $2000 per annum, Miss Maloney to continue to receive the $1000.

On Miss Lambert's death testator directed the house to be sold, and further directed as follows :

[Cuthbertson's Appeal.]

"Item 14th. On the death of my wife and her sister, Elizabeth A. Lambert, I desire that the sum that was set apart to produce the yearly income for the maintenance of my wife, her sister Elizabeth A. Lambert, and her cousin Mary Ann Maloney, be now merged with my other estate, and the whole disposed of by my executors, at sale or otherwise, that the several legacies that commenced with item No. 20 may be paid, and the estate settled up in the shortest possible time. I desire to draw the attention of my executors to the difference in value in property at present and what it may be in the future on the decease of Elizabeth A. Lambert, and as the several legacies numbering from twenty up to thirty-nine will only be paid after her decease, the aggregate being more or less, the items or sums will be proportioned accordingly."

Testator then, from Item 20 to Item 39 of his will, bequeathed various legacies, amounting in all to $173,000. Among others were the following:

Item 20th. I give and bequeath to each of the children of my friend, Mrs. James Cuthbertson, of Leith, Scotland, to Agnes, now Mrs. Georgeson, twenty-five thousand dollars ($25,000).

Item 21st. To William, eldest son of Mrs. Cuthbertson, twenty-five thousand dollars ($25,000).

Item 22d. To James, second son of Mrs. Cuthberson, twenty-five thousand dollars ($25,000).

Item 23d. To Jeanie, youngest daughter of Mrs. Cuthbertson, twenty-five thousand dollars ($25,000).

Item 26th. To three executors of my estate ten thousand dollars ($10,000) each ($30,000).

Item 27th. To Louisa Harrison, of Philadelphia, five thousand dollars ($5000).

Item 28th. To Mrs. N. P. Murphy, of Philadelphia, five thousand dollars ($5000).

Item 29th. To Mrs. Louisa Lambert, of Philadelphia, three thousand dollars ($3000).

Item 30th. To Pennsylvania Hospital, Philadelphia, five thousand dollars ($5000).

Item 34th. To Old Man's Home, Philadelphia, five thousand dollars ($5000).

Item 37th. To Zoological Garden Park, Philadelphia, ten thousand dollars ($10,000).

Of this will he appointed John S. Yardley, Henry E. Busch and Horace Yardley, executors.

John S. Yardley was a conveyancer, a personal friend of testator, often employed by him in conveyancing matters.

In the early part of November 1876, Mrs. Neill became very sick. Neill had at about the same time a stroke of paralysis, which, though not very severe, crippled the use of his right arm. Within two weeks he had another stroke, and shortly afterwards Mrs. Neill

died. There was some evidence that about this time Neill had a third stroke, but whether this was prior or subsequent to December 2d did not clearly appear.

The testimony as to the effect upon testator of the paralysis and the loss of his wife was contradictory. William Cuthberson, who lived with him, testified that he was affected seriously, both mentally and physically; that after the first stroke he was unable to manage his business, could not write, could not converse, and could only sign checks and receipts by the aid of some one guiding his hand; that on December 2d he was in such a condition that he could not have read a testamentary instrument, nor have understood it when read to him, unless each item had been read over and explained carefully; that in all probability he would have forgotten all about the preceding item while the next was being explained; that his speech was at that time affected, and, although he might have been able to speak a little, it could only have been understood with difficulty and by those who were constantly about him; and finally that he had observed no change in Neill's feelings towards the Cuthbertson family. Miss Lambert testified that at this time Neill was broken down with sorrow, and that his speech was very bad and imperfect. Distinguished medical experts also testified that paralytic strokes such as suffered by Neill might have, and sometimes did, bring about such a mental and physical condition as above set forth.

On the other hand, other witnesses testified to a wholly different condition of affairs at this date. Dr. Thomas M. Drysdale, who had attended him during his sickness, testified that Neill's mind was then perfectly clear, and his memory good; that there was no difficulty about his speech, and that he had about that time talked understandingly on business topics. This account received confirmation from several other witnesses who had seen testator at about the same period, and who, although they thought him physically weak, detected no mental weakness nor difficulty in speech.

Miss Lambert also testified as follows: "The doctor said to me, 'Mr. Neill's disease is progressing rapidly, and if he has any business to settle you had better speak to him about it, as he is so nervous I don't like to speak with him.' Then I did speak to him. I said, 'Mr. Neill, what is to become of me if anything happens to you?' 'You are provided for,' he said. He then said to me 'Get the will and read it.' I got it and read it to him. Then he said, 'Send for John S. Yardley.' When Mr. Yardley came in (on the evening of December 1st 1876), I handed him the will, I think; Mr. Neill, Mr. Yardley and myself being present in the second story back building, I mean the back room in the front building. I then said, 'Mr. Yardley, will you see if this holds the same for me as before our trouble?' He then commenced reading the will until he came to the large legacies. When it

came to the Cuthbertsons', which was $25,000, he seemed to think it was an enormous sum. He said, 'Mr Neill, do you think your estate will hold out to pay these large legacies?' and he then came to some of my friends—Miss Harrison, Mrs. Lambert, &c., and Mrs. Murphy—and Mr. Neill just waved his hand in this way (witness waves her hand outstretched and horizontally), and then I put my two hands together upon my breast in this manner (witness clasps her hands and presses them upon her breast), and I said, 'Oh, they are poor!'

"Mr. Yardley then said, 'Well,' says he, 'say a $1000.' I can't say positively about the other parts, except the Old Man's Home. The other parts I can't remember about. He said, 'The Old Man's Home is a very good institution, let that remain.'

"Mr. Yardley said that. I don't remember the other until Mr. Neill spoke himself. 'I give to my friend John Yardley, $10,000.' Mr. Neill said that. Mr. Yardley then said, 'Well, Mr. Neill, there will be a residue, and will that go to the heirs and assigns?' and Mr. Neill said 'Yes.' That is all that was said. There was nothing more said."

Yardley, that night, drafted a codicil to testator's will, confirming the bequests to Miss Lambert and Miss Maloney, reducing the legacies, beginning with item 20, in all, from $173,000 to $35,000, cutting down, inter alia, the legacies to William and Jeanie Cuthbertson and of Agnes Georgeson from $25,000 to $2500, those to Louisa Harrison and Mrs. Murphy from $5000 to $1000, that to Mrs. Lambert from $3000 to $1000, that to the Pennsylvania Hospital from $5000 to $1000, that to the Zoological Society from $10,000 to $2500, leaving intact the legacies to the Old Man's Home and to the executors, and bequeathing all the residue of his estate to Yardley. The estate was worth, in all, several hundred thousand dollars. How much was comprehended in the bequest of the residue did not appear, but undoubtedly somewhere about $300,000.

The next morning (December 2d), Yardley stopped at Neill's house with his draft of the codicil. Miss Lambert then testified substantially as follows:

"Yardley read the draft of the codicil he had made to Neill; Neill said nothing during the whole interview. Yardley then said he was going to have the codicil engrossed, but promised to return that evening that the testator might sign it. He proposed that William C. McPherson, a friend of the testator, should be called in as a witness, and undertook to bring him. He suggested also that the attending physician, Dr. Drysdale, should be called in for a like purpose, and I undertook to send for him.

"In the evening, Yardley stopped again, in company with McPherson, bringing with him the codicil engrossed. Dr. Drysdale and one Caleb R. Keeney, a neighboring druggist and friend

of testator, were sent for. The testator then, being unable from paralysis to write, signed the codicil with a cross. McPherson, Drysdale and Keeney signed as subscribing witnesses. I then put the codicil away; but on the next day, at Neill's request, read it to him again. He made no remark, and I then placed it in his chest, where it remained until his death."

Miss Lambert's evidence was contradicted in most essential particulars by Yardley.

He testified that testator, on first sending for him, had received him cordially, and given him verbal directions as to a codicil to his will which he desired to have drawn, instructing him to insert a provision against the lapse of his bequests to Miss Lambert and Miss Maloney, and voluntarily proposing and directing the reduction of the legacies. That he then asked testator, "What disposition do you want to make of the rest and residue of your estate?" Whereupon testator answered, "For the many valuable services you have rendered me, I give it to you, my friend, John S. Yardley, and no one else." That, on returning next day with the draft, he read it to the testator, who distinctly replied that it was all right, and as he wanted. That testator then requested him to call again in the evening with the codicil engrossed, and to bring with him McPherson as a witness, promising to send for Dr. Drysdale and Keeney as the other witnesses. That he did so, and finding on his arrival that Dr. Drysdale and Keeney the other proposed witnesses were not yet come, he again read aloud the codicil to the testator in the presence of Miss Lambert and McPherson, explaining some parts as he went along, and finally asking testator if it was all right, to which he replied, "It is, it's what I want." That Dr. Drysdale and Keeney coming in shortly after, testator made his mark to the codicil, and the signatures of the witnesses were then affixed. During all these transactions, Yardley was of opinion that the testator's mind appeared perfectly clear and sound, and his speech plain.

As regards some of the facts testified to by him, Yardley was amply corroborated by the subscribing witnesses. McPherson testified to the truth of the whole account of the visit at the time of the execution of the codicil, as described by Yardley, and stated that testator had verbally expressed his assent to the codicil just before affixing his mark. Dr. Drysdale testified similarly as to the assent. Keeney was unable to say whether the assent was verbal or by signs. All agreed that the testator's mind appeared clear, and that he could converse freely and intelligently.

Shortly after this occurrence Neill became distinctly affected with aphasia—a disease produced by the paralysis, and showing itself in a gradual weakening of the mental faculties and an almost complete loss of the power of speech. The evidence was somewhat contradictory as to when this disease became first clearly marked.

[Cuthbertson's Appeal.]

Some witnesses placed the time in the latter part of December 1876 or early part of January 1877; others in February 1877. In September 1877 Neill died.

His executors presented both the will and codicil for probate, which were accordingly admitted by the register of wills, and letters testamentary issued thereon. From the decision of the register, admitting the codicil to probate, James Cuthbertson, James Georgeson and Agnes, his wife, in right of said Agnes and Jeanie Cuthbertson, appealed to the Orphans' Court, and subsequently filed therein a petition for an issue *devisavit vel non* to test the validity of the same. In these proceedings William Cuthbertson declined to take part, alleging as his reasons that he feared that his doing so would distress his friends. Miss Lambert and Miss Maloney, the Contributors to the Pennsylvania Hospital and the Zoological Society of Philadelphia, were allowed, on petition, to intervene in the proceedings.

An examiner was appointed and testimony taken, and on January 17th 1880, the court, in an opinion by HANNA, P. J. (PENROSE, J., filing a concurring opinion), entered a decree dismissing the appeal and refusing the issue. The applicants for the issue and those intervening in the application thereupon took this appeal, assigning for error the decree of the court.

*Henry J. McCarthy* and *William A. Porter*, for James Cuthbertson, Agnes Georgeson and Jeanie Cuthbertson, appellants.— There was evidence to go to a jury that testator was not at the time of the making of the alleged codicil of sound testamentary capacity: Irish *v.* Smith, 8 S. & R. 576; McTaggart *v.* Thompson, 2 Harris 154. The provisions of the codicil, and the extraordinary and unreasonable change they would appear to indicate in testator's feelings, constitute clear evidence of incapacity, and may be taken into account: Leech *v.* Leech, 5 Clark 86; Hauberger *v.* Root, 6 W. & S. 431; Bitner *v.* Bitner, 15 P. F. Smith 347; Clark *v.* Fisher, 1 Paige's Ch. 175. Even if Neill's condition did not amount to absolute incapacity to make a will, it is nevertheless clear that his mind was so weakened that the burden of proof is on Yardley to show clearly the fact that no improper advantage was taken by him of testator's condition. Such is always the duty of those who draw wills giving large benefits to themselves, when a testator's testamentary capacity is impaired: Dean *v* Negley, 5 Wright 317; Daniel *v.* Daniel, 3 Id. 209; Newhouse *v.* Godwin, 17 Barb. 236; Beall *v.* Mann, 5 Ga. 470; Krepps *v.* Krepps, 4 Brewster 38; Duffield *v.* Robeson, 2 Harrington 384; Tomkins *v.* Tomkins, 1 Bail. 92; Clark *v.* Fisher, 1 Paige Ch. 175; Ingram *v.* Wyatt, 1 Hagg. 384; Greville *v.* Tylee, 24 Eng. L. & Eq. 53; Durling *v.* Loveland, 2 Curteis 225; Baker *v.* Batt, 2 Moore's P. C. C. 317; Segrave *v.* Kirwan, 1

[Cuthbertson's Appeal.]

Beatty, Jr. Ch. 157.   The case is directly ruled by Boyd v. Boyd,
16 P. F. Smith 283.   An issue should have been awarded.

*A. Sydney Biddle* and *George W. Biddle,* for the Contributors
to the Pennsylvania Hospital, appellants.—The testimony as to
Neill's mental incapacity was very strong.   He was not able to
dispose of his property with clear understanding and memory:
Marquis of Winchester's Case, 6 Rep. 23 a; Mountain v. Ben-
nett, 1 Cox 353 ; Greenwood v. Greenwood, 3 Curteis Appendix;
Marsh v. Tyrrel, 2 Hagg. 122 ; Harwood v. Baker, 3 Moore P. C.
282 ; Harrison v. Rowan, 3 Wash. C. C. 580; Den v. Johnson, 2
South. 454; Boyd v. Eby, 8 Watts 66 ; Converse v. Converse, 21
Vt. 168 ; Clark v. Fisher, 1 Paige Ch. 171.

The law will most scrupulously scrutinize any will drawn up by
a confidential adviser whereby a large benefit is conferred upon
himself.   More particularly will they do this where there is any
indication of testator's mental incapacity: White & Tudor's L. C.
Eq. 1192, 1216, 1226, 1268, 1282, 1284, &c., and cases cited.
In such case the onus is cast upon the adviser to prove the bona
fides of the transaction : Boyd v. Boyd, 16 P. F. Smith 283.
Nor is this case overruled by Frew v. Clarke, 30 P. F. Smith 170.
In this latter case the testator's mental incapacity was not shown,
and besides the case was decided by a divided court.

[SHARSWOOD, C. J.—The question on which the court differed
in opinion was the competency of the witness Clarke.   Judge PAX-
SON and I dissented on the ground that the paper was not a will,
but a contract *inter vivos,* and in that view Clarke could not have
been a witness under the Act of 1869, because the other party to
the contract was dead.]

Yardley should be called upon to show the fairness of the whole
transaction to the satisfaction of a jury.   If he fails to do this,
the whole codicil should be set aside, it being impossible to dis-
tinguish what parts of it were and were not produced by undue
influence: Hughton v. Hughton, 15 Beav. 278 ; Cooke v. Lamotte,
Id. 234; Florey v. Florey, 24 Ala. 241; Irwin v. Keen, 3 Whart.
347; Davis v. Calvert, 5 Gill & J. 269; Tyler v. Gardiner, 35
N. Y. 559.

*W. W. Montgomery and Samuel Wagner,* for the Zoological
Society of Philadelphia, appellant, presented no paper book nor
argument, but submitted the case to the court on the paper books
furnished in the other appeals.

*Robert N. Willson* for the appellees.—Mere impairment or
weakness of mind is insufficient to invalidate a will.   To effect this
the mind of the alleged testator must have been so far impaired as
that from defect either of memory, judgment, or discernment, he

[Cuthbertson's Appeal.]

did not really know and intend what he was doing when he executed the testamentary paper, or it must stand good: McMasters v. Blair, 5 Casey 298; Thompson v. Kyner, 15 P. F. Smith 368; Tawney v. Long, 26 Id. 106; Cauffman v. Long, 1 Norris 72. It cannot be pretended that there was evidence that Neill's mind was affected to this extent, even if there was a conflict of testimony on this point; it is equally well settled in this state that an issue will not be granted, when upon consideration of the whole case, the court is of the opinion that a verdict against the will ought not to be sustained: Graham's Appeal, 11 P. F. Smith, 43; Cozzens's Will, Id. 196; De Haven's Appeal, 25 Id. 337; Wainwright's Appeal, 8 Norris 220. Nor was there sufficient evidence of undue influence to go to a jury. Mere persuasion or solicitation does not amount to such influence: Miller v. Miller, 3 S. & R. 267; Tawney v. Long, 26 P. F. Smith 106. It does not exist unless the mind of the testator is subjugated by some kind of coercion which subverts his independence, destroys his free agency, and substitutes the will of another for his own, at the very time when the act of disposition takes place: McMahon v. Ryan, 8 Harris 329; Eckert v. Flowry, 7 Wright 46; Thompson v. Kyner, 15 P. F. Smith 368. Boyd v. Boyd, 16 P. F. Smith 283 is not applicable here. There a weak mind, illiteracy, extreme physical debility, and a lack of acquaintance with business transactions, were all shown to co-exist in the testator. Here the case is not near so strong as regards the testator's physical and mental condition. The case is ruled by Frew v. Clarke, 30 P. F. Smith 170.

Chief Justice SHARSWOOD delivered the opinion of the court, February 14th 1881.

Boyd v. Boyd, 16 P. F. Smith 283, established a general principle of the highest importance for the protection of persons who call in professional or other advisers to assist them in making their last wills. That principle may be briefly stated thus: Where the alleged testator is shown by evidence to be weak in mind, whether arising from age, bodily infirmity, great sorrow, or other cause tending to produce such weakness, though not sufficient to create testamentary incapacity, and the person whose advice has been sought and taken receives a large benefit under the instrument propounded as a will, it must be shown affirmatively that the alleged testator had full understanding of the nature of the disposition contained in it. The general rule undoubtedly is that testamentary capacity and knowledge of the disposition made are presumed. Where the testamentary capacity is perfect, fraud or undue influence must be shown. In such case the undue influence must be such as to destroy the freedom of will of the party, or at least very much to impair it. But not so in the case of an old, infirm and mentally weak man, disposing of his estate in favor

of his confidential adviser. These principles were all affirmed and recognised in Frew *v.* Clarke, 30 P. F. Smith 170. That case did not in the least shake the principle of Boyd *v.* Boyd, which was fully supported by the authorities, and is founded on sound principle and the wisest policy. Wills are generally prepared according to instructions given to the scrivener privately, when no one else is present; and to hold that in the case supposed it is sufficient to prove the formal execution of the paper in the presence of witnesses, and then throw upon the contestants the burden of proving fraud, undue influence, misrepresentation or mistake, would open the door wide for the arts of the cunning and designing to succeed in their nefarious purposes. Every man who draws a will in his own favor, under such circumstances, should know that he will be required to prove affirmatively all the circumstances connected with the drawing of the will, and that it must appear that the alleged testator was laboring under no mistaken apprehension as to the value of his property and the amount he was giving to his confidential adviser. It has been decided that the beneficiary himself is a competent witness to prove the will. He cannot complain, then, that the rule is hard or unjust which requires him to make it clearly appear that the gift to him was the free, intelligent act of the testator. In truth, we were not called on in Frew *v.* Clarke to re-examine the decision in Boyd *v.* Boyd. In the latter case it was held merely that upon the evidence there given the judge below was right in submitting the case to the jury. In Frew *v.* Clarke, upon the trial of the issue of *devisavit vel non* below, the question had been submitted to the jury, and the verdict sustained the instrument propounded as a will. Mr. Justice MERCUR says, in the opinion of the court delivered by him : "If the mental capacity of McCully (the testator) had been impaired, if he had become weak from age or bodily infirmity, although not to such an extent as to destroy his testamentary capacity, it might have shifted the burden of proof, and required the defendant in error (the legatee) to negative by evidence a presumption of undue influence. It is shown, however, that McCully's mental capacity was not impaired." Of course, upon the principle of Boyd *v.* Boyd, the judgment of the court below had to be affirmed. There were other questions in the case. Whether the paper propounded was a will or an obligation sealed and delivered *inter partes*, and whether, conceding it to be testamentary, Clarke, the legatee, was a competent witness to prove it. Upon these questions the court was divided, but not upon the general principle settled in Boyd *v.* Boyd.

We consider that the case presented on these appeals is entirely within that principle. Had the only question been on the testamentary capacity of John L. Neill there would be reason to hold that there was not sufficient evidence to justify a jury in setting

[Cuthbertson's Appeal.]

aside the codicil. Had it been drawn without advice and suggestion by Neill himself, as was the original will, it must have stood. But it cannot be disputed that there was evidence, we think enough to carry the case to a jury, that the testator was not the same man physically and intellectually when he executed the codicil as when he made the original will. A jury might reasonably so conclude from the evidence. Then the onus was thrown on Yardley to prove that Neill fully understood the value of his property and the probable residue after paying all his legacies. It would not be proper for us to express any opinion upon the weight of the evidence as bearing upon this question. Upon the issue to be granted, it must be submitted to a jury under proper instructions from the court.

There may be a case where the alleged undue influence is applicable only to a single independent provision in a will, and that provision may fail, leaving the rest of the will to stand. It is certainly not this case, where the clause objected to is a residue, and that residue made up or largely increased by alterations made, as a jury may conclude, under the same influence for that purpose. It may be, however, that if the bequest of the residue in the codicil fail and the rest stands, the general direction of the will in the fourteenth item will apply to the legacies in the codicil as taking the place merely of the legacies from item 20 up to item 39 in the original will. Upon this point we express no opinion. In either case the appellants have an interest to contest the codicil.

Decree reversed. And it is ordered and decreed that the issue prayed for in the court below be granted, and the record remitted for further proceedings.