461 A.2d 259

ESTATE OF Alexander YOUNGER, Deceased.

Appeal of AMERICAN COMMITTEE OF WEIZMAN INSTITUTE OF SCIENCE, INC. and Philadelphia Geriatric Center.

Superior Court of Pennsylvania.

Argued March 10, 1982.

Filed May 27, 1983.

Lawrence Barth, Deputy Attorney General, Philadelphia, for Commonwealth, participating party.

Carol Suzanne Buechner, Herman Bloom and Mervin J. Hartman, Philadelphia, for Ocks and Levin, participating parties.

Dilworth, Paxson, Kalish & Kauffman, Harry A. Kalish, John M. Elliott (argued), Joseph P. Dougher, Philadelphia, for Weizman Institute of Science, Inc.

Kohn, Savett, Marion & Graf, P.C., Harold E. Kohn (argued), Bayard M. Graf, Philadelphia, for appellants Philadelphia Geriatric Center and American Committee of Weizman Instit. of Science, Inc.

Before WICKERSHAM, CIRILLO and LIPEZ, JJ.

LIPEZ, Judge:

In this will contest, the American Committee for the Weizman Institute of Science, Inc. (Weizman) and the Philadelphia Geriatric Center (Geriatric) appeal from the decision of the Orphans' Court *en banc*, affirming the decree of the hearing judge which upheld the admission to probate of a writing dated September 8, 1976, as the last will and testament of Alexander Younger.[1] Contestants Weizman and Geriatric contend that the court erred in upholding the probate of this writing because it was the product of undue influence exerted upon the testator by two of the will's

1. The majority opinion of the Orphans' Court *en banc* was authored by Judge Silverstein and joined by three judges. Judges Shoyer and Jamison filed dissenting opinions. The *en banc* decision dismissed contestants' exceptions to the decision of the hearing judge, affirmed his opinion and decree, and entered an appropriate decree. The final decree was thus entered on July 16, 1981, and an appeal may properly be taken. *See Hassler v. Columbia Transmission Corp.*, 294 Pa.Super.Ct. 86, 439 A.2d 762 (1982).

   A question was raised in argument as to the timeliness of contestants' filing of notice of appeal with the lower court. A clerical error in docketing the notice of appeal has been corrected, however, and the record now includes a corrected copy of docket entries, certified by the lower court, which reveals that notice of appeal was filed on July 20, 1981, within the applicable time limit. Pa.R.A.P. 903. We will thus consider the merits of contestants' appeal.

beneficiaries: testator's attorney, Herbert L. Ocks; and Mark Levin, manager of testator's business property.

## I

The probate will (Will No. 5) was executed on September 8, 1976, in the office of proponent Ocks, who was also the will's scrivener. It was witnessed by Ocks and his secretary, Jacqueline Belletieri. The will gave $10,-000.00 to each of the testator's three nieces and two nephews (his only surviving relatives), $20,000.00 to his secretary, $10,000.00 to a former employee, $5,000.00 to a friend, *$50,000.00 to his "friend and attorney" Herbert L. Ocks, $25,000.00 to his "friend and faithful employee" Mark Levin,* and $100,000.00 to his "friend and long-time companion" Mauro Dominquez. The residue of the $1,100.000.00 estate was given 40% to Dominquez, *40% to Ocks* and *20% to Levin.* Testator's friend Caswell F. Holloway was named executor and the testator appointed proponent Ocks as attorney for the executor.[2]

Testator had previously executed four other wills: Will No. 1, dated December 11, 1972; Will No. 2, dated December 17, 1973; Will No. 3, dated January 19, 1976; and Will No. 4, dated September 1, 1976. Proponent Ocks was the scrivener of all but Will No. 1.

Will No. 1 gave $5,000.00 to each of the testator's nieces and nephews; $10,000.00 to his secretary; $5,000.00 to his housekeeper; and $30,000.00 to Mauro Dominquez. The residue was given in trust for the benefit of the Weizman Institute of Science in Rehovot, Israel. The First Pennsylvania Banking and Trust Company was appointed executor, and the will was executed in a conference room of the bank. The witnesses were a trust officer of the bank and William J. MacDermott, Esquire, the will's scrivener.

**2.** This appointment, although indicative of testator's intention, does not bind the executor to use Ocks as his attorney. Every executor has the right to choose his own attorney. *Kreider Estate,* 11 Leb.Co.Legal J. 122, 42 Pa.D. & C.2d 46 (1966), *aff'd mem.,* 426 Pa. 617, 233 A.2d 226 (1967).

In Will No. 2, drawn by Ocks, the testator gave $10,-000.00 to each of his nieces and nephews; $10,000.00 to his secretary; $5,000.00 to his housekeeper; $5,000.00 each to three friends; the greater of 10% of the net value of the estate or $100,000.00 to Mauro Dominquez, and also provided for payments of $1,000.00 a month to be made to Dominquez by the executor during the period between testator's death and the distribution of the estate. The residue was given in trust to the Philadelphia Geriatric Center, with Caswell F. Holloway, Mark Levin and Herbert L. Ocks appointed as attorney for the executor. The will was executed on December 17, 1973 and witnessed by Ocks and his secretary, Molli S. Robbins.

Will No. 3, executed January 19, 1976, again gave $10,-000.00 to each of testator's nephews and nieces. It gave $25,000.00 to testator's secretary, $10,000.00 to his housekeeper, $10,000.00 to each of four friends, and *$50,000.00 to Ocks.* Mauro Dominquez was given the greater of 10% of the estate or $150,000.00 and was to receive monthly payments of $1,000.00 as in Will No. 2. The Philadelphia Geriatric Center was to receive the residue through a trust identical to that set up in Will No. 2. Caswell F. Holloway was again named executor, with Ocks appointed as his attorney. The will, drafted by Ocks, was witnessed by one of Ocks' law partners and by Ocks' secretary, Milli S. Robbins.

Will No. 4 was executed on September 1, 1976, only one week before the probated will. It gave $10,000.00 to each of testator's nieces and nephews, $20,000.00 to his secretary; $10,000.00 to a friend; $5,000.00 to another friend; *$50,000.00 to Ocks;* and *$25,000.00 to Levin.* Mauro Dominquez was again to receive the greater of 10% of the estate or $150,000.00 and monthly payments of $1,000.00 for up to two years between testator's death and the distribution of the estate. The residue was given 50% to Dominquez, *35% to Ocks* and *15% to Levin.* Caswell F. Holloway was named as executor, with Ocks to serve as his attorney. The

will was witnessed by Ocks and his secretary, Jacqueline Belletieri.

At the hearing on contestants' challenge to the probate of Will No. 5, it was stipulated that Alexander Younger had testamentary capacity when all five wills were executed, that a confidential relationship existed between testator and proponent Ocks, and that Ocks, Levin and Mauro Dominquez received the bulk of testator's estate under Will No. 5. Testimony was given by testator's secretary and a long-time friend as to testator's relationships with Levin and Dominquez. The secretary, testator's housekeeper and a real estate specialist with whom testator negotiated a lease near the time that Will No. 5 was executed, gave testimony as to testator's physical and mental abilities, his attention to business matters and his disposition. Several medical doctors were also called and gave testimony at considerable length on the issue of testator's medical condition, both physical and mental. Weighing all of this evidence, the hearing judge concluded that while Ocks and Levin had confidential relationships with testator, Mauro Dominquez did not and that testator not only had testamentary capacity at the time Will No. 5 was executed, but also had an intellect which had not been significantly weakened by his physical ailments.

In determining whether contestants had proved their allegations of undue influence with regard to Will No. 5, the hearing judge applied the test established in *Boyd v. Boyd*, 66 Pa. 283 (1870), and its progeny:

When the proponent of a will proves that the formalities of execution have been followed, a contestant who claims that there has been undue influence has the burden of proof. The burden may be shifted so as to require the proponent to disprove undue influence. To do so, the contestant must prove by clear and convincing evidence that there was a confidential relationship, that the person enjoying such relationship received the bulk of the estate, and that the decedent's intellect was weakened.

*Estate of Reichel,* 484 Pa. 610, 614, 400 A.2d 1268, 1270 (1979).[3] The court therefore held that, as testator's intellect was not weakened, the burden of proof remained on contestants to prove undue influence by clear and convincing evidence, *see Brantlinger Will,* 418 Pa. 236, 250, 210 A.2d 246, 254 (1965), and that they had failed to meet this burden. Opinion of the hearing judge at 36–44. The Orphans' Court *en banc,* applying the same standards for shifting the burden of proof as had been utilized by the hearing judge, reviewed the evidence and affirmed the decision of the hearing judge.

## II

In examining the decision of the Orphans' Court in this case, our review is "limited to determining whether the findings of fact approved by the court *en banc* rest on legally competent and sufficient evidence, and whether an error of law has been made or an abuse of discretion committed." *In re Estate of Ziel,* 467 Pa. 531, 536–37, 359 A.2d 728, 731 (1976) [citations omitted]. This review is made viewing the record in the light most favorable to the appellees. *In re Estate of Fickert,* 461 Pa. 653, 657, 337 A.2d 592, 594 (1975).

Here, the hearing judge painstakingly summarized and carefully considered the evidence presented by all parties, and his findings and conclusions were thoughtfully reviewed by the lower court *en banc.* We find no abuse of discretion which would warrant our disturbing the lower court's factual findings or its conclusion that testator did not have a weakened intellect during the time relevant to

**3.** *Boyd v. Boyd, supra,* and several other cases treating the issue of undue influence set forth two additional requirements to shift the burden of proof: that the beneficiary be a stranger to the blood of the testator; and that the beneficiary have been involved in the drawing and execution of the will. *Boyd, supra,* 66 Pa. at 293–94. The three-part test set forth above, however, is almost equally long-standing, *See Cuthbertson's Appeal,* 97 Pa. 163, 171 (1881). The two rules were reconciled, and the three-part test held to be all that must be satisfied to shift the burden of proof, in *Estate of Clark,* 461 Pa. 52, 59–61, 334 A.2d 628, 631–32 (1975).

the execution of Will No. 5. Moreover, we find that, with respect to proponent Levin, the lower court applied the proper legal standard in assigning the burden of proof on the issue of undue influence.

### III

As to proponent Ocks, however, we must reach a different result, for we conclude that the lower court erred in applying the same standard to assign the burden of proof of undue influence in the case of attorney Ocks as was used in the case of layman Levin. This error of law compels us to vacate the order of the Orphans' Court.

In assigning the burden of proof of undue influence with regard to Ocks' actions, the lower court relied on *Gold Will,* 408 Pa. 41, 182 A.2d 707 (1962) and *Paul Will,* 407 Pa. 30, 180 A.2d 254 (1962). In both of those cases, the Supreme Court upheld wills making large gifts to the attorneys who drafted them and stated that, absent proof that testator's intellect was weakened, the burden of proving undue influence was on the contestants. However, both *Gold* and *Paul* were decided before the Supreme Court's adoption of the Code of Professional Responsibility on February 27, 1974. 455 Pa. lvii. We find that the Code changed the law in this area, overruling *Gold* and *Paul sub silentio.*[4]

The Code of Professional Responsibility was adopted by order of the Supreme Court as "the standard of conduct for attorneys of all the courts of the Commonwealth." 455 Pa. lvii. It is comprised of three separate but interrelated

---

**4.** The effect of the Code of Professional Responsibility on the law regarding gifts by testators of unweakened intellect to attorney-scriveners is a question of first impression in Pennsylvania. Since adoption of the Code, only one case addressed by our appellate courts has involved the allegation that undue influence was exerted by an attorney who also drafted the challenged will. *In re Thomas' Estate,* 463 Pa. 284, 344 A.2d 834 (1975). There, however, it was clear that the testator's intellect was greatly weakened at the time that the will was drafted and executed. Since a presumption of undue influence was thus raised even under the rule of *Gold* and *Paul,* the possibility that the Code had changed the law in cases where weakened intellect is not present was not before the court.

parts: (1) the Canons, which are "axiomatic norms" expressing in general terms the standards of professional conduct; (2) the Ethical Considerations, which are a body of principles representing "objectives toward which every member of the profession should strive"; and (3) the Disciplinary Rules, which "state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." Code Prof.Resp., Preliminary Statement. The Code has the "force of statutory rules of conduct for attorneys" in Pennsylvania. *American Dredging Co. v. City of Philadelphia,* 480 Pa. 177, 183, 389 A.2d 568, 571 (1978).

Contestants claim that Ocks' actions in connection with the challenged will were contrary to the standards set out in Canon 5 and Ethical Considerations (EC) 5–5 and 5–6 of the Code. Canon 5 provides that "[a] lawyer should exercise independent professional judgment on behalf of a client." EC 5–5 and 5–6 deal with particular situations in which that independent professional judgment may be compromised. EC 5–5 provides:

A lawyer should not suggest to his client that a gift be made to himself or for his benefit. *If a lawyer accepts a gift from a client, he is peculiarly susceptible to the charge that he unduly influenced or overreached the client. If a client voluntarily offers to make a gift to his lawyer, the lawyer may accept the gift, but before doing so, he should urge that his client secure disinterested advice from an independent, competent person who is cognizant of all the circumstances. Other than in exceptional circumstances, a lawyer should insist that an instrument in which his client desires to name him beneficially be prepared by another lawyer selected by the client.* [emphasis added]

EC 5–6 provides:

A lawyer should not consciously influence a client to name him as executor, trustee, or lawyer in an instrument. *In those cases where a client wishes to name his*

*lawyer as such, care should be taken to avoid even the appearance of impropriety.* [emphasis added]

## A.

Ocks does not deny that he failed to comply with the provisions of these ethical considerations. Rather, he asserts that the violations are irrelevant because they are raised in the context of a will contest rather than a disciplinary proceeding. His argument on this point is three-pronged. First, he contends that the Orphans' Court and this court are without jurisdiction to enforce the Code of Professional Responsibility. He claims that such jurisdiction is vested exclusively in the Supreme Court, with the assistance of the Disciplinary Board, Hearing Committees and Disciplinary counsel, by Pennsylvania Rules of Disciplinary Enforcement 201 and 205–207. Second, he argues that even if a violation could be acted upon by the Orphans' Court, it could do so only by imposing one of the sanctions of Rule of Disciplinary Enforcement 204, not by denying Ocks his bequest. Third, he asserts that even the bodies with proper jurisdiction over disciplinary actions would be unable to act here because Ocks violated only Ethical Considerations, while disciplinary measures may be imposed only for violations of Disciplinary Rules under Rule of Disciplinary Enforcement 203(a). We find this argument to be without merit.

■ It is true that the Supreme Court has exclusive jurisdiction over *disciplinary* actions, and that in such actions, specifically prescribed sanctions are imposed when a Disciplinary Rule of the Code of Professional Responsibility has been violated. Pa.R.D.E. 201, 203, 204. Contestants did not ask the lower court to discipline Ocks, however. Rather, they asked that in considering their claims of undue influence the court take into account the fact that Ocks had ignored clear language of the Ethical Considerations in

drafting wills by which he took a large bequest. We agree that this should have been considered.[5]

The fact that the Orphans' Court may not disbar, suspend or otherwise officially censure an attorney for professional misconduct does not preclude it from recognizing the requirements of the Code of Professional Responsibility and enforcing the Code in other ways. Indeed, despite its reservation of jurisdiction over disciplinary proceedings, in *American Dredging Co. v. City of Philadelphia, supra,* the Supreme Court held that "[t]he trial court in the first instance has the power to regulate the conduct of attorneys practicing before it, and has the *duty* to insure that those attorneys act in accordance with the Code of Professional Responsibility." *Id.,* 480 Pa. at 183, 389 A.2d at 571 [emphasis added]. Moreover, the *American Dredging* opinion makes it clear that this duty extends to the Canons and Ethical Considerations as well as the Disciplinary Rules of the Code. There, in considering a motion to disqualify an attorney for conflict of interest, the court found that violations of Ethical Considerations 5–14 and

**5.** We note that in several states, disciplinary action has been taken against attorneys drafting testamentary documents in which they were beneficiaries, even though no Disciplinary Rule of the Code of Professional Responsibility expressly prohibits it. *See* American Bar Association Commission on Evaluation of Professional Standards, *Model Rules of Professional Conduct,* Proposed Final Draft, Rule 1.8, Legal Background, Paragraph (c) (1981), *citing Committee on Professional Ethics and Conduct of State Bar Association v. Behnke,* 276 N.W.2d 838 (Iowa 1979); *Columbus Bar Association v. Ramey,* 32 Ohio St.2d 91, 290 N.E.2d 831 (Ohio 1972); *State v. Gulbankian,* 54 Wis.2d 599, 196 N.W.2d 730 (Wis.1972). Since our action today is not disciplinary in nature, we need not decide whether disciplinary sanctions could be imposed for violations of EC 5–5 and 5–6 under Pennsylvania law. However, we believe that a substantial question is presented as to the propriety of disciplinary action being taken against Ocks either for those violations or possible violations of DR 1–102(A)(4) or (5) ("DR 1–102 Misconduct. (A) A lawyer shall not: ... (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. (5) Engage in conduct that is prejudicial to the administration of justice."). We will therefore direct the Prothonotary of this court to furnish a certified copy of the opinion to the Disciplinary Board of the Supreme Court of Pennsylvania, for such further proceedings as may be appropriate. *See Polascik v. Baldwin,* 245 Pa.Super.Ct. 1, 5–7, 369 A.2d 263 (1976).

5-15 constituted a violation of Canon 5 which the court treated as a ground for disqualification independent of other violations which it found. *American Dredging*, then, can be said to stand for the proposition that a trial court may, in fact *must*, take notice of violations of the Ethical Considerations of the Code and act to rectify or prevent such violations in matters which come before it. It follows that the Orphans' Court was not powerless to recognize and act upon Ocks' violations of Ethical Considerations 5-5 and 5-6 in the case before us.

### B.

We turn, then, to a consideration of the proper treatment of these admitted violations. The Code, of course, does not absolutely prohibit gifts from clients to attorneys. Indeed, the provisions of EC 5-5 and 5-6 are merely safeguards to protect both the client and the lawyer involved with such a gift from an abuse of their confidential relationship or the appearance that such abuse has occurred. It would thus be inappropriate for us to impose an inflexible rule that whenever the protective provisions of EC 5-5 and 5-6 are violated, undue influence must be found. The very presence of such safeguards in the Code, however, logically implies that where they have been disregarded we must examine the transaction more closely and that we need not stand helplessly by and allow an officer of the court to profit by his failure to follow "the accepted standards of right conduct." [6] A consideration of the interrelationships of Code provisions dealing with this problem and a comparison of those provisions with the prior ethical standards which

---

**6.** "My analysis of the judicial process comes then to this, and little more: logic, and history, and custom, and utility, and the accepted standards of right conduct are the forces which singly or in combination shape the progress of the law." B. Cardozo, *The Nature of the Judicial Process* 112 (1921).

"The judiciary is, then, on the one hand a guardian of the law's continuity, stability, evenhandedness, and predictability and on the other hand a participant in creative evolution that keeps law contemporary and viable." Keeton, *Courts and Legislatures as Agencies of Abrupt Change*, in *The Judicial Process* 840 (R. Aldisert 1976)

shaped existing Pennsylvania case law are helpful in determining what form this closer examination should take.

*Gold Will, supra,* and *Paul Will, supra,* are, as proponent Ocks maintains, the leading Pennsylvania cases dealing with the validity of testamentary gifts to attorney-scriveners. When these cases were decided, the ethical standards in effect were those of the predecessor to the Code of Professional Responsibility: The American Bar Association Canons of Professional Ethics. These Canons were cast in much more general language than that employed by the Code and were intended to serve only as "a general guide" in determining the duties of a lawyer in a particular situation. American Bar Association Canons of Professional Ethics, Preamble. They did not attempt, as does the Code of Professional Responsibility, to set down specific rules or "standards by which to judge the transgressor." Code Prof.Resp., Preamble. Of the Canons of Professional Ethics, the only one which gave any guidance to an attorney asked to draft a will by which he was to benefit was Canon 11 headed, "Dealing With Trust Property." It provided, in part, that "[t]he lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client." This language, while abjuring the exploitation of a confidential relationship by undue influence or other means, was little more than a pious admonition against actual misconduct. It provided no safeguards to give guidance to the actions of lawyers who wished to act ethically in situations like the one before us, and it did not prohibit or even attach any significance to the preparation by a lawyer of an instrument under which he was a beneficiary. Since the Canons imposed no ethical duties upon the lawyers in *Gold* and *Paul* and gave no guidelines by which their conduct could be assessed, the Supreme Court had no reason to judge the conduct of those lawyers under a standard more stringent than that applied to the conduct of laymen. Applying the rule of *Boyd v. Boyd* and its proge-

ny, the Court therefore placed the burden of proving undue influence upon the contestants in those cases just as it would have done had the wills been prepared by laymen.

Since the court's adoption of the present Code of Professional Responsibility, however, this is no longer possible, for this Code *does* attach particular significance to the fact that an attorney has drafted a will under which he is a beneficiary. EC 5-6 recognizes the extreme delicacy of such a situation by noting that even where the attorney is only to serve as executor, trustee or lawyer under an instrument he has drafted, care must be taken to avoid even the appearance of impropriety.[7] EC 5-5 states that whenever a lawyer accepts a gift from his client "he is peculiarly susceptible to the charge that he unduly influenced or over-reached his client" and therefore that "[o]ther than in exceptional circumstances, [he] ... should insist that an instrument in which his client desires to name him beneficially be prepared by another lawyer ...." These provisions set forth a clear standard of conduct for attorneys in situations like the one before us, and our Supreme Court has given that standard the "force of [a] statutory rule of conduct," *American Dredging, supra,* thus imposing a duty of compliance. When that duty is breached, an attorney leaves himself "peculiarly susceptible" to charges of undue influence, according to the Code. Courts dealing with the document in question must recognize the Code's provision as a sound statement of public policy and act accordingly. We therefore hold that where an attorney drafts a will under which he is a beneficiary, a presumption of undue influence arises, regardless of the mental condition of the testator, and shifts the burden of proof to the attorney-scrivener to show by clear and convincing evidence that the gift arose from the will of the testator and not

7. Canon 9 of the Code provides that in all situations a lawyer should avoid even the appearance of impropriety. That this warning should be explicitly reiterated in EC 5-6 is a clear additional indication of the Code's disfavor of documents like the will before us.

from improper influence by the attorney.[8]

Because the burden of proving undue influence was placed on contestants by the lower court, and because the court found that this burden had not been met, proponent Ocks was not required to put on evidence to disprove undue

**8.** This presumption is identical to that which has long been recognized in Pennsylvania where a lawyer takes a gift from his client through a non-testamentary instrument of his own preparation, *see, e.g., Meara v. Hewitt*, 455 Pa. 132, 314 A.2d 263 (1974), and is an established principle of the law of wills and estates in many jurisdictions. Indeed, in recognizing such a presumption, we adopt what appears to be the majority view on this issue. *See* Bookstaver, *Execution and Validity of Wills and Inter Vivos Trusts*, 24 U.Pitt.L.Rev. 404, 408–09 (1975). *See also* Annot., 19 A.L.R.3d 575, 585–92. It should be noted that because this presumption is raised by the Code of Professional Responsibility, it will be applied only where an *attorney* is both scrivener and beneficiary. As to laymen, the *Boyd v. Boyd* line of cases remains controlling. Our adoption of a stricter standard to be applied where the conduct of a lawyer is involved in these cases is in keeping with the concern of the Code of Professional Responsibility for the integrity of the profession and with the Code's imposition upon every lawyer of a duty to act with that integrity in mind. *See* Code Prof.Resp., Canon 1, Canon 9, EC 1–1, 1–5, 9–1, 9–2, 9–6, DR 1–102(A)(4), (6). This concern is eloquently expressed in the American Bar Association Model Code of Professional Responsibility, DR 1–102(A)(6) n. 14, quoting Justice Frankfurter's concurring opinion in *Schware v. Bd. of Bar Examiners*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957):

> It is a fair characterization of the lawyer's responsibility in our society that he stands as a shield, to quote Devlin, J., in defense of right and to ward off wrong. From a profession charged with these responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as 'moral character.'

> We also find it significant that as a result of its reassessment of the Code of Professional Responsibility, the American Bar Association Commission on Evaluation of Professional Standards has included the following provision in its proposed final draft (May 30, 1981) of the Model Rules of Professional Conduct:
> Rule 1.8  *Conflict of Interest: Prohibited Transactions*
> . . . . .
> (C) A lawyer shall not prepare an instrument giving the lawyer or a member of the lawyer's family any gift from a client, including a testamentary gift, except where the client is a relative of the donee.

The Commission's research notes to Rule 1.8(c) indicate that this rule was included as a reflection of the prevailing substantive law, which holds that a lawyer-beneficiary's participation in the preparation or execution of a will raises a presumption of undue influence.

influence. The record developed by the lower court is thus insufficient for this court or the Orphans' Court *en banc* to resolve the will challenge under the rule that we adopt here. Accordingly, we must vacate both the final decree and the decree nisi entered by the Orphans' Court and remand to the hearing level. The hearing judge shall conduct such further proceedings as may be necessary to complete the record, resolve the question of undue influence and fashion an appropriate remedy if undue influence is found.[9]

Order vacated; case remanded for proceedings consistent with this opinion. The Prothonotary of this Court is directed to furnish a certified copy of this opinion to the Disciplinary Board of the Supreme Court of Pennsylvania, for such further proceedings as may be appropriate. Jurisdiction is relinquished.

**9.** We do not decide whether undue influence, if found, must invalidate the entire will or only portions of it, nor do we determine the proper disposition of funds which would have to be redistributed should portions of the will be found invalid. These are questions which should be explored in further hearings and the resolution of which involves an analysis of facts properly within the province of the hearing judge. We do note, however, that if Will No. 5 is found to be invalid in its entirety, the presumption of undue influence will also apply to Wills 3 and 4, both of which were drafted by Ocks and gave him a sizeable bequest.