508 A.2d 327

**ESTATE OF Alexander YOUNGER, Deceased.**

**Appeal of AMERICAN COMMITTEE OF WEIZMANN INSTITUTE OF SCIENCE, INC. and Philadelphia Geriatric Center.**

Superior Court of Pennsylvania.

Argued Dec. 18, 1985.

Filed April 29, 1986.

John M. Elliott, Philadelphia, for appellants.

Before CIRILLO, MONTEMURO and POPOVICH, JJ.

POPOVICH, Judge:

This is an appeal from the order, later reduced to judgment, of the Orphans' Court of Philadelphia County, sitting en banc, denying the exceptions of the appellants, American Committee of Weizmann Institute of Science, Inc. and Philadelphia Geriatric Center, and confirming the last Will of the decedent (Alexander Younger). We affirm.

The facts surrounding the execution of the 81-year-old decedent's fifth, and final, Will admitted to probate are well-documented in the opinions of the Orphans' Court (per Judge Gutowicz) and this Court in response to the appellants' initial appeal in *Estate of Younger*, 314 Pa.Super. 480, 461 A.2d 259 (1983), overruled 505 Pa. 530, 482 A.2d 215 (1984). We find it, therefore, unnecessary to reiterate those facts here.

The first issue concerns whether the appellants/contestants have satisfied their burden of proving that the decedent had such a "weakened intellect" that all but the No. 1 and No. 2 Wills executed by him should be held untainted by any evidence of undue influence.

 Although all parties concede, as evidenced in the opinions of the Orphans' Court dated August 26, 1980, and this Court in *Estate of Younger, supra*, that the decedent did have a confidential relationship with the attorney-scrivener-beneficiary, and he did leave this individual a substantial part of his estate,[1] the failure of the contestants to

---

1. Of the estimated one million dollar estate, the scrivener-beneficiary would be in line to inherit, before taxes, approximately $342,000.00. However, the distributive scheme benefitting the decedent's two nephews, three nieces and his secretary (totalling $70,000) remained rela-

establish by clear and convincing evidence that the testator was suffering from mental infirmities falls short of their entitlement to have the last Will and Testament (No. 5) of the decedent, or, for that matter, any of the other previous testamentary documents, voided. Wills Nos. 1–4 were properly revoked by the decedent, and no evidence has been presented to us to hold otherwise.

As the Orphans' Court so aptly stated in this matter: This Court is fully aware of the financial interest Ocks [attorney-scrivener-beneficiary-appellee] has in the outcome of the instant will contest. However, we find nothing improbable, implausible, inconsistent, in short, nothing incredible, in his testimony. He paints a picture of the testator which matches perfectly that drawn by Dr. LaVan and Mrs. Sullivan. Dr. LaVan noted,

"If he (Alexander Younger) had a mental quality that one might look at I would have to call it stubbornness and a tenacity to do things his way ..." (NT 168)

Mrs. Sullivan had been with the testator since 1942; he spoke to her almost daily; and yet, he never discussed the contents of his wills with her. (NT 280) However, he did keep the original of each will in his possession while it was current. (NT 81) And, he phoned Mrs. Sullivan in January of 1976 and again in January of 1977, to tell her where his current will could be found. (NT 280) This Court finds, as a fact, that Alexander Younger was indeed an elderly gentleman who knew exactly what he was doing when he executed each and every one of the wills in question. Neither his body nor his mind was the "prisoner" of any of the proponents. "... (his) failure to secure independent counsel is not controlling under the circumstances." *Paul Will, supra,* at 45. We are unconvinced that Will No. 4 and Will No. 5 would not have been produced but for the failure of [Attorney] Ocks to inform Geriatric [contestant/appellant] of their existence.

tively constant throughout all of the Wills. Further, the legatees that remained appeared with consistency throughout Wills Nos. 2–5.

■ We have been presented with no evidence to require that the burden of proof (burden of non-persuasion) should have been shifted to the proponents in light of the contestants' failure to prove by clear and convincing evidence that the decedent was suffering from a weakened mental condition during the drafting and execution of the last Will so as to invalidate its distributive scheme. See *In re Estate of Ziel*, 467 Pa. 531, 359 A.2d 728 (1976); *In re Gold's Estate*, 408 Pa. 41, 182 A.2d 707 (1962); see also *Estate of Reichel*, 484 Pa. 610, 400 A.2d 1268 (1979); *In re Estate of Agostini*, 311 Pa.Super. 233, 457 A.2d 861 (1983).

It must be noted that counsel for the proponent admitted that the decedent had certain physical debilities.[2] However, the decedent's attending physician testified that during the period Mr. Younger was a patient (from November of 1975 until his death in 1977, which included a minimum of thirty office and hospital visits) there was no sign that he was "non compos in any way whatsoever." The doctor also opined that Younger was "in total control and was in good mental shape", such that he, because of his tenacious and stubborn attributes, could not be influenced or persuaded to do anything he did not wish to do. The decedent's secretary of some ten years, a Ms. Sullivan, echoed these sentiments.

■ The only evidence proffered by the contestants came from individuals who either never met the decedent, or, in the case of his prior physician, had not seen him since November of 1975. Thus, their assessment of mental instability is to be accorded little weight vis-a-vis the views of the attending physician, Ms. Sullivan and a George Ludwin, all of whom had personal contact with the decedent during

---

2. E.g., arteriosclerotic cardiovascular disease, Parkinsonism, chronic lymphatic leukemia and diabetes mellitus. The decedent's attending physician noted that all the maladies were being treated and, for instance, the Parkinsonism was a disease primarily of the motor activity and did not affect mentation at all. As for leukemia, the doctor stated it was really benign and most patient's in Younger's age group die of some other causes. Also, both the diabetes mellitus and Parkinsonism were diagnosed as "mild". This was all told to Mr. Younger.

the crucial time the Will in question was executed. See *In re Estate of Agostini, supra.* All agreed that the decedent appeared to be of sound mind and not open to persuasion inconsistent with his own thinking.

The presence of a confidential relationship and substantial benefit to the scrivener/attorney in the decedent's Will, in the absence of a weakened intellect does little to advance the appellants' case. Compare *In re Estate of Clark,* 461 Pa. 52, 334 A.2d 628 (1975); *In re Estate of Button,* 459 Pa. 234, 328 A.2d 480 (1974); *In re Stewart's Estate,* 354 Pa. 288, 47 A.2d 204 (1946); *In re Patti's Estate,* 133 Pa.Super. 81, 1 A.2d 791 (1938). Likewise, the stipulation by the parties that the decedent possessed testamentary capacity impairs their argument further as to the claim that the decedent was "unduly influenced" to dispose of his estate in a manner inconsistent with his true intent. Such an argument, as with the others advanced by the appellants, has no merit. See *Wetzel v. Edwards,* 340 Pa. 121, 16 A.2d 441 (1940).

As for the second claim raised by the appellants, i.e., that the court below erred in not re-opening the case when confronted with the contention that one of the beneficiaries (Mauro Dominquez—now deceased) was blackmailing the decedent (which supposedly precipitated his inclusion in all five Wills), we find this argument untenable.

On October 25, 1984, the Orphans' Court filed its opinion disposing of the appellants' exceptions. Therein, the court made mention of the January 6, 1984 letter of the appellants concerning the alleged blackmail. As observed by the Orphans' Court in its October 25th opinion, after making reference to the letter of January 6th, "To date, no substantiation of the aforementioned 'allegation' has been presented." (Opinion at 12)

The inaction of the appellants during a 10-month period to introduce evidence regarding its assertion of "undue influence" is not justified, even though a request for a stay of 60 days to investigate the matter was never granted by the

court. No effort was made by the appellants during the lapse of 10 months—between the request for the stay and the ultimate adjudication—to offer to the court below (or, for that matter, this Court) *the fruits of its efforts in this area*. Thus, the appellants will not be heard to complain now. See *Barrows v. Allum*, 361 Pa. 624, 66 A.2d 66 (1949).

▮ Also, we wish to mention that the recent decision of our Supreme Court in *Estate of Pedrick*, 505 Pa. 530, 482 A.2d 215 (1984), in which the application of the equitable doctrine of clean hands precluded the scrivener-beneficiary from probating the decedent's Will, is inapplicable here. As noted by Chief Justice Nix in his Concurring Opinion, the actions of the attorney shocked the conscience in that he procured a substantial interest in the decedent's estate by his inclusion in the Will. However, in *Pedrick*, unlike the case at bar, the presence of a confidential relationship was coupled with the presence of a testator suffering from a weakened intellect prior to the execution of the Will. Since there was no evidence produced by the contestants here that the decedent was suffering from a mental infirmity, we see no reason to impose the sanction referred to in *Pedrick* to remedy the attorney's conduct at bar.

Attorney Ocks' conduct, although regrettable, does not rise to the level justifying a revocation of Younger's fifth Will. We are dismayed, but not shocked, by the actions of the attorney/appellee. Unlike in *Pedrick*, where the scrivener-attorney-beneficiary never had the Will witnessed, the attorney here prepared the last four Wills of the decedent, all of which were witnessed.[3] Thus, we do not equate the condemnation of the attorney's actions in *Pedrick* to the facts sub judice. Accordingly, the remedial measure provided for in *Pedrick* need not be resorted to here.

"It has been said many times that one may by will dispose of his property as he sees fit and that he is entitled to act on his own prejudices." See *In re Patti's Estate*,

---

3. Wills Nos. 2, 4 and 5 were witnessed by Ocks and a secretary in the law office. Will No. 3 was witnessed by one of Ocks' law partners and a secretary in the law office.

*supra,* 133 Pa.Super. at 95, 1 A.2d at 798. In other words, it being the prerogative of any man to dispose of his estate as he sees fit, it is not the function of any court of equity to invalidate a testamentary disposition in the absence of, e.g., undue influence, the components of which—weakened intellect, confidential relationship and substantial benefit—have not *all* been established to the level of clear and convincing evidence instantly.

We have carefully reviewed the record, including the testimony of the contestants and of the attending physician and of the other witnesses presented and of the attorney who drew the Will. Little would be accomplished by further detailing the extensive testimony, or in quoting the applicable principles of law which have often-times been reiterated by our Supreme Court and this Court alike. Suffice it to say that in reviewing the record and the actions and rulings of the hearing court, in light of all the evidence and the pertinent legal principles, we find that the findings of the Orphans' Court, which were approved by the court en banc, were based upon legally competent and sufficiently convincing evidence, and that there was no error of law or abuse of discretion.

We affirm the actions of the court below.