482 A.2d 215

**In re ESTATE OF Joseph C. PEDRICK, Deceased.**

**Appeal of John GREGORY.**

Supreme Court of Pennsylvania.

Argued April 11, 1984.
Decided Sept. 10, 1984.

Thomas J. Mettee, Philadelphia, for appellant.

J. Brooke Aker, Norristown, for Geo. A. Butler, Jr.

Before NIX, C.J., and LARSEN, FLAHERTY, McDER-MOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

HUTCHINSON, Justice.

This is an appeal by allowance from a Superior Court panel's *per curiam* order, 311 Pa.Super. 602, 458 A.2d 267. The panel affirmed an order of the Orphans' Court Division of the Court of Common Pleas of Philadelphia. Orphans' Court entertained the appeal of George A. Butler, Jr. from a decree of Philadelphia's Register of Wills, reversed the Register and directed him to admit to probate testator Joseph C. Pedrick's September 27, 1979 will written by appellee George A. Butler, Jr. That will distributed the testator's entire estate to appellee and his brother, Edmund B. Butler. It also named appellee executor. The sole question before us is the effect of appellee's conduct as attorney-scrivener-beneficiary on his right to use Orphans' Court process to secure a benefit under the will from conduct which, while not illegal, is not only far below those standards acceptable in the legal profession, but additionally plainly frustrates full equitable inquiry into the substantive issues presented. On the undisputed facts of this case, we hold that appellee, proponent of the September 27, 1979 will, came into equity with unclean hands. Thus, the Orphans' Court erred in granting him affirmative relief. Therefore, we reverse.

The testator, Joseph C. Pedrick, unmarried and childless, one time Clerk of the United States Court of Appeals for the Third Circuit, made at least four wills in his lifetime. The first two were prepared in 1959 and 1972 by his long time personal attorney, appellee's father. In them he left his modest estate to that attorney. In the course of time the father was joined in his legal practice by his sons, this

appellee and Edmund, appellee's brother. Still later, in 1975, death came to the father, but his two sons continued the family law firm. In August of 1977 testator came one day to the law firm his dead friend had founded. That he did so is undisputed. Whether he and appellee quarreled is unclear.[1] However, about one month later he sought the services of Thomas Mettee, Esquire. Mr. Mettee prepared a third will in which Mr. Pedrick left his entire estate to a boy he had raised, John Gregory, the appellant here.

On September 27, 1979, Mr. Pedrick, old and sick, lay in St. Mary's Hospital. On that day he learned from his doctor that the cancer which now invaded his prostate, spine, liver and lung would kill him and that he should prepare for death. Along with this terminal process he then suffered from acute congestive heart failure, acute dyspnea, arteriosclerosis, diverticulosis and hernia. These maladies had visited his mind and body with a downhill course over the two years since his last will. Impending death medically confirmed, he asked a nursing sister to call the Butler law firm to see to his will. The nurse, Sister Catherine Joseph, called appellee to come to the hospital. In response to that call appellee went to the hospital although he found it most inconvenient. There, on that day, in that condition, while alone with the son and namesake of his dead friend and attorney, testator signed his fourth will leaving his still modest estate to the scrivener and the scrivener's brother. No witness, disinterested or otherwise, attested that will. That will was not re-executed or republished in the presence of any witness whatsoever when appellee returned alone two days later to have testator name appellee himself beneficiary on testator's federal pension.

1. Appellant John Gregory testified that decedent visited appellee because appellee had refused to help Gregory cash decedent's pension check and to make a deposit despite the fact that decedent had requested Mr. Gregory to do so. He further testified that decedent and appellee quarreled. Appellee testified that he remembered decedent visited his office in August of 1977 but that he did not remember what the visit was about.

The Register had a hearing and denied appellee's will probate. Appellee then sought the aid of the Orphans' Court Division, a court in which equitable principles apply. That court noted appellee's "unfortunate and inexcusable" conduct, but nevertheless opened its halls to aid him because it could not find undue influence under our governing case law. However, it did ignore the maxim that he who asks the sovereign, in its conscience, to support him, must put out hands undirtied in the matter where he seeks the sovereign's aid.

The Code of Professional Conduct to which members of appellee's profession were held at the time he did this "unconscionable" act does not have the force of substantive law. To the extent *Estate of Younger*, 314 Pa.Superior Ct. 480, 461 A.2d 259 (1983), holds otherwise, it is disapproved. *See infra*, at 541–542. Thus, appellee's failure to live up to that Code, standing alone, would not invalidate this will. Here, however, we have not only a clear departure from ethical standards, but other conduct which plainly frustrates a determination based on untainted disinterested evidence as to whether this testator freely willed his worldly goods to appellee and appellee's brother. Appellee's failure to secure any witness to what transpired between him and the testator, despite the second opportunity created when he came back two days later to effect a beneficiary change in his own favor, effectively insulated the will he prepared to his own benefit from any acceptable inquiry into the very issue before the court, undue influence. A court applying equitable principles is not open to such a supplicant.

To better understand our holding in this case a full recital of the record on which the lower courts acted is necessary.

Because there were no witnesses to the execution of the will or to the conversation between Mr. Butler and Mr. Pedrick, appellee gave the only testimony as to what took place between him and Mr. Pedrick on September 27. He testified that he and Mr. Pedrick had exchanged pleasantries. He also testified that although Mr. Pedrick did not

know he was George Butler, Mr. Pedrick recognized him as one of the Butler brothers and asked him about his brother's family. N.T. 140–43. He said that Mr. Pedrick then told him he wanted to make a will. When Mr. Butler asked Mr. Pedrick "what do you want in your will," he gestured and said "I want you to take it." Appellee said he replied, "... Joe, that's very kind of you, thanks for that, but is there anybody else you want to consider?" The decedent was said to answer, "No. I want you to take it." Appellee continued by stating that he then thanked the testator and asked, "... since you are giving it to me ... would you have any objection if I would divide that and give part of it away to my brother?" The testator is said to have answered that he had no objections and to again have stated that he wanted appellee to have everything. N.T. 143–44. According to Butler, he then asked Mr. Pedrick whom he wanted to name as his executor and Mr. Pedrick replied "you are taking it ... you act." N.T. 144. Appellee then hand drafted the will and Mr. Pedrick executed it. Appellee said they then talked about mutual friends and appellee's father. By his own admission, appellee made no effort to obtain subscribing witnesses to the will because, in his experience, medical personnel are reluctant to become involved in preparation of such documents and he did not "think" there were any ambulatory patients around.[2] N.T. 168–69.

Appellee admitted that he was familiar with Ethical Consideration 5–5 of the Code of Professional Responsibility which provides:

A lawyer should not suggest to his client that a gift be made to himself or for his benefit. If a lawyer accepts a gift from his client, he is peculiarly susceptible to the charge that he unduly influenced or over-reached the

---

**2.** "With the exception of those wills which are signed by mark or by another person acting by the express direction of the testator, subscribing witnesses are not required in Pennsylvania although most wills drawn by professional hand provide for such attestation...." 1 Remick's Pennsylvania Orphans' Court Practice § 3.05, at 98 (revised ed. 1975).

client.  *If a client voluntarily offers to make a gift to his lawyer, the lawyer may accept the gift, but before doing so, he should urge that his client secure disinterested advice from an independent, competent person who is cognizant of all the circumstances.  Other than in exceptional circumstances, a lawyer should insist that an instrument in which his client desires to name him beneficially be prepared by another lawyer selected by the client.*

Emphasis added.  However, he stated that he did not have someone else draft the will because "the call I received from Sister Catherine placed emphasis on the fact that he wanted to see me that night."  Most experienced practitioners would find such an explanation not implausible.  Indeed, in the case of a testator *in extremis*, or one who dies without further opportunity to republish his will, the need for immediate preparation may well render execution in this manner wholly ethical, despite a testamentary disposition to the receiver.  However, that explanation fails in the face of appellee's own testimony that he returned to the hospital on September 29 to obtain Mr. Pedrick's signature on a change of beneficiary form naming appellee himself beneficiary.[3]  Although he did not believe that Mr. Pedrick was dying appellee thought it "prudent" to execute the change of beneficiary form immediately because he expected to be away from Philadelphia for six weeks.  He excused his failure to have someone else draft a will before that second visit by his belief that the will was valid and because "it was a busy time at the office and time was of an absolute premium."  There was no evidence that he made any effort to have the will benefitting him and his brother re-executed

3.  It would appear that Mr. Butler's conduct also implicates Ethical Consideration 5–6 of our Code of Professional Responsibility which provides:

> A lawyer should not consciously influence a client to name him as executor, trustee, or lawyer in an instrument.  In those cases where a client wishes to name his lawyer as such, care should be taken by the lawyer to avoid even the appearance of impropriety.

and republished in the presence of disinterested subscribing witnesses.[4]

Mr. Pedrick died six months after he executed this fourth will. The Register of Wills admitted the third will to probate over the caveat of appellee who thereafter submitted the fourth will for probate. That will was also admitted to probate. The Register of Wills then held an evidentiary hearing at which he considered John Gregory's challenge to the fourth will on alternative grounds of undue influence at the hands of appellee and Mr. Pedrick's lack of testamentary capacity at the time he executed the fourth will. After that hearing, the Register entered a decree admitting the third will to probate and denying probate of the fourth will appellee had prepared. Mr. Butler appealed to Common Pleas' Orphans' Court Division. After a series of hearings on the same questions raised before the Register of Wills, the Court held that the fourth will was not obtained by undue influence, vacated the Register's decree and ordered him to admit the fourth will to probate. Orphans' Court Division and Superior Court each affirmed *en banc*. This appeal followed.

The Orphans' Court considered only the issues of testamentary capacity and undue influence. No question is raised before us with respect to its finding that the testator had the capacity to make a will. Indeed, that determination is amply supported on this record. In dealing with the undue influence issue the court considered only the issues of burden of proof and determined that once a proponent of a will establishes a formal execution, the burden shifts to the contestant to show undue influence.[5] If the contestant

4. Appellee also testified that the family law firm had performed substantial legal services for testator for which they had received only nominal payments. He further testified that at the time the fourth will was executed in 1979 testator "owed" the firm several thousand dollars.

5. This Court has defined undue influence sufficient to void a will as: [I]mprisonment of the body or mind, frauds or threats or misrepresentations, or circumstances of inordinate flattery, or physical or moral coercion to such a degree as to prejudice the mind of the

then shows by clear and convincing evidence that a stranger to the blood of the testator in a confidential relationship receives the bulk of an estate from a testator of weakened intellect, a presumption of undue influence arises and the burden of proof shifts back to the proponent to prove affirmatively the absence of undue influence. *Estate of Reichel,* 484 Pa. 610, 400 A.2d 1268 (1979); *Re Quein's Estate,* 361 Pa. 133, 62 A.2d 909 (1949). Moreover, purporting to follow this Court's decisions in *Re Estate of Paul,* 407 Pa. 30, 180 A.2d 254 (1962), and *Re Estate of Gold,* 408 Pa. 41, 182 A.2d 707 (1962), the Orphans' Court held that the fact that the attorney who drafted the will was also a beneficiary under it, coupled with the fact that he failed to advise the testator to seek independent counsel, does not shift the burden of proving undue influence to the attorney-scrivener-beneficiary. In so doing the court seemed to ignore the difference between the general debilitation that so weakens the intellect as to make the old and the sick peculiarly subject to influence and the markedly more serious loss of faculties which deprive a testator of the capacity to make a will. *See supra* at 218, n. 3. So treating the matter the hearing judge first concluded, based on appellee's testimony, that appellants had failed to produce clear and convincing evidence that Joseph Pedrick's intellect was weakened and, therefore, that they retained throughout the burden of persuading him of undue influence.[6] The hearing

testator, or destroy his free agency or to operate as a present restraint upon him in the making of a will.
*Re Quein's Estate,* 361 Pa. 133, 145, 62 A.2d 909, 915 (1949).

**6.** The hearing court chose not to believe testimony of Dr. De and Dr. Connor, Mr. Pedrick's treating physicians, to the effect that as a result of organic brain syndrome and arteriosclerosis he was forgetful, disoriented and depressed. Dr. De, who was treating Mr. Pedrick for arteriosclerotic heart disease, congestive heart failure and cardiomegaly, described Mr. Pedrick as "quite forgetful, depressed" and withdrawn and stated Mr. Pedrick's memory was grossly impaired and that he frequently lost his train of thought. The hearing judge erroneously stated that Dr. Connor's testimony was "vague" and "ambiguous." Dr. Connor specifically testified that decedent was "not capable of physically or mentally taking care of himself"; that decedent was at times "cognizant" but would then "go off on a tangent"; and that his arteriosclerosis affected his mental capability. The only

judge then determined that appellants had not proved by clear and convincing evidence that appellee exercised undue influence over Mr. Pedrick. Alternatively, the hearing judge stated that even if the burden of proof with respect to undue influence had shifted to appellee under the medical and other evidence, appellee's own testimony clearly and convincingly showed that he had not exerted undue influence. We note, however, that the hearing judge relied heavily on Mr. Pedrick's previous wills as evidence of an unfettered intention to confer a benefit on the Butlers. In so doing he emphasized the long years of service which Mr. Butler, Sr. had provided to Mr. Pedrick. Although the Orphans' Court *en banc* affirmed these findings, it did conclude that appellee, who, "over the years had earned the

"vague" or ambiguous testimony was on the issue of "testamentary capacity" not "weakened intellect." Moreover, the hearing judge disregarded the testimony of contestant Gregory and a social worker regarding Mr. Pedrick's deteriorating mental state. The hearing judge also determined Dr. De's statements were vague and contradictory because he had also testified that depression and withdrawal were normal responses of terminal cancer patients. The hearing judge stated that Mr. Pedrick's difficulty in following directions and answering questions "could as easily be attributed to Dr. De's heavy and pronounced Indian accent as to any supposed mental weakness of decedent." The hearing court instead relied heavily on Sister Catherine Joseph's testimony as to Mr. Pedrick's mental state on September 27, 1979. Under our decision in *Re Estate of Clark*, 461 Pa. 52, 334 A.2d 628 (1975), this over-emphasizes the testator's mental state on the date he executed the will. In *Clark* we stated:

> [W]eakened mentality as relevant to undue influence need not amount to testamentary incapacity.... In other words, the particular mental condition of the [testator] on the date [he] executed the will is not as significant when reflecting upon undue influence as it is when reflecting upon testamentary capacity. More credence may be given to the ... remote mental history.

461 Pa. at 65, 334 A.2d at 634. As stated, slip op. at 10–11, the hearing judge apparently did not clearly distinguish between testamentary capacity and weakened intellect. "Where a person has testamentary capacity, but is so weak physically or mentally as to be susceptible to undue influence, and a substantial part of his estate is left to one occupying a confidential relation to him, the burden is upon the latter to show ... no improper influence...." *Williams v. McCarroll*, 374 Pa. 281, 296, 97 A.2d 14, 20 (1953) (quoting *Re Phillips' Estate*, 244 Pa. 35, 43–44, 90 A. 457, 460 (1914)). On this record it is clear that the chancellor applied an erroneous legal standard and that his findings on the testator's mental state are not supported by the record.

confidence of this court," here "engaged in unfortunate and inexcusable" conduct. The court *en banc* stated appellee's failure to advise the testator to seek the advice of independent counsel violated Ethical Consideration 5–5 of the Code of Professional Responsibility. Appellee does not dispute that finding.[7]

■ Appellant John Gregory argues here, relying on a Superior Court panel decision, *Estate of Younger*, 314 Pa. Superior Ct. 480, 461 A.2d 259 (1983), that an attorney who drafts a will under which he is a beneficiary in violation of Ethical Considerations 5–5 and 5–6 of the Code of Professional Responsibility, shifts the burden of proof to himself to show by clear and convincing evidence that the gift arose from the will of the testator and not from the attorney's improper influence.[8] Appellant further argues that the testimony of the attorney-scrivener-beneficiary should be deemed incompetent as a matter of law. *See Kraynick v. Hertz*, 443 Pa. 105, 109, n. 2, 277 A.2d 144, 146, n. 2 (1971).

7. The proposed Model Code of Professional Responsibility more explicitly prescribes the conduct barred by Ethical Consideration 5–5 of the present Code. We note it without implying our position on it. Rule 1.8(c) of the proposed Code states:

> A lawyer shall not prepare an instrument giving the lawyer or a person related to the lawyer as parent, child, sibling or spouse any substantial gift from a client including a testamentary gift, except where the client is related to the donee.

14 Pa. Bulletin 17 (January 7, 1984).

8. The *Younger* holding is inconsistent with *Paul* and *Gold*. It is sometimes justified as following the majority view. 314 Pa.Superior Ct. at 494, 461 A.2d at 266 (citing Bookstaver, *Execution and Validity of Wills and Inter Vivos Trusts*, 24 U.Pitt.L.Rev. 404, 408–09 (1975)); Annot., 19 A.L.R.3d 575, 585–92. We do not find that view persuasive. In *Younger*, however, Superior Court accurately notes that at the time we decided *Paul* and *Gold* the American Bar Association Canons of Professional Ethics which governed the conduct of attorneys did not proscribe an attorney from drafting an instrument under which he takes as a beneficiary. Canon 11 merely admonished a lawyer "to refrain from any action whereby for personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client." For the reasons noted in the text, at 541, we disapprove the *Younger* court's holding that an attorney-scrivener-beneficiary's violation of the Code of Professional Responsibility provides a basis for shifting the burden of proof on the issue of undue influence to him.

*Cf. In Re Wertman Estate,* 462 Pa. 195, 340 A.2d 429 (1975).

Appellant finally argues that the Orphans' Court was constrained to apply these rules of law based on its obligation to enforce the Code of Professional Responsibility which our Court adopted by rule on February 27, 1974 and which have the effect of statutory rules governing all attorneys. *See Estate of Younger,* 314 Pa. at 492, 461 A.2d at 265–66 (citing *American Dredging Co. v. City of Philadelphia,* 480 Pa. 177, 183, 389 A.2d 568, 571 [1978] ). We reject these arguments in the form presented. Moreover, we disapprove of the broad implications of Superior Court's holding in *Estate of Younger.* There, Superior Court purporting to overrule *Paul Will* and *Gold Will,* concluded that the Orphans' Court, in the first instance, has the power to regulate the conduct of attorneys practicing before it. It does not have such general power by virtue of our Code of Professional Responsibility. However, this Court has held in several cases that counsel can be disqualified for violations of the Code where disqualification is needed to insure the parties receive the fair trial which due process requires. *See American Dredging Co., supra; City of Philadelphia v. AFSCME,* 503 Pa. 498, 469 A.2d 1051 (1983). *See also Commonwealth v. Eastern Dawn Mobile Home Park, Inc.,* 486 Pa. 326, 405 A.2d 1232 (1979) (plurality opinion); *Slater v. Rimer, Inc.,* 462 Pa. 138, 338 A.2d 584 (1975). In several other cases we have *sua sponte* referred instances of apparent attorney misconduct to the Disciplinary Board.[9] We have not, however, heretofore used such misconduct as a basis for altering the rules of law, including evidentiary rules, presumptions and burdens of proof, which would otherwise apply to a case. We decline to do so here.

■ Thus, while it may be appropriate under certain circumstances for trial courts to enforce the Code of Professional Responsibility by disqualifying counsel or otherwise restraining his participation or conduct in litigation before

---

9. This Court has adopted a comprehensive set of rules for enforcing the Code of Professional Responsibility. *See* Pa.R.D.E. 101–219.

them in order to protect the rights of litigants to a fair trial, we are not inclined to extend that enforcement power and allow our trial courts themselves to use the Canons to alter substantive law or to punish attorney misconduct. This view is consistent with both Article V, Section 10(c) of our Constitution which places disciplinary power in us, and the preamble to the Model Rules of Professional Conduct adopted by the American Bar Association in August of 1983 and recommended to this Court for adoption, with amendments, by the Pennsylvania Bar Association House of Delegates on October 28, 1983:

> The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule. Accordingly, nothing in the Rules should be deemed to argument any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such duty.

14 Pa. Bulletin 8 (January 7, 1984).

Here, however, an attorney whose conduct the record shows was "unfortunate and inexcusable" comes into a court applying equitable principles to secure a benefit from the very conduct which the accepted standards of the profession preclude. Such conduct may constitute "unclean hands" which bars relief in equity. We hold it does on the facts in this case for the following reasons.

██ In the exercise of the limited jurisdiction conferred on it by statute, it is plain that the Orphans' Court must apply the rules and principles of equity. *Estate of Hahn,* 471 Pa. 249, 369 A.2d 1290 (1977); *Estate of Freihofer,* 405 Pa. 165, 174 A.2d 282 (1961); *Re Douglas' Estate,* 303 Pa. 227, 154 A. 376 (1931). Thus, the familiar equity maxim "he who comes into a court of equity must come with clean hands" applies to matters within the Orphans' Court's jurisdiction. *Re Cross' Estate,* 319 Pa. 1, 179 A. 38 (1935); *Re Hays' Estate,* 159 Pa. 381, 28 A. 158 (1893). *See also Weber Estate,* 15 Fid.Rep. 464, 57 Berks 163 (1965).

■ The maxim itself "is derived from the unwillingness of a court to give relief to a suitor who has so conducted himself as to shock the moral sensibilities of the judge, and it has nothing to do with the rights or liabilities of the parties. Public policy not only makes it obligatory for the court to deny relief, once a party's unclean hands are established, but to refuse the case." *Gaudiosi v. Mellon,* 269 F.2d 873, 881 (3d Cir.), *cert. denied,* 361 U.S. 902, 80 S.Ct. 211, 4 L.Ed.2d 157 (1959).[10]

> This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief.... That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. Thus while "equity does not demand that its suitors shall have led blameless lives" ... as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue....

*Shapiro v. Shapiro,* 415 Pa. 503, 506–507, 204 A.2d 266, 268 (1964) (quoting *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 814–15, 65 S.Ct. 993, 997–998, 89 L.Ed. 1381 [1945]).[11]

**10.** Because of that public policy the court may raise *sua sponte* the doctrine of unclean hands. *See id.* at 881. Although the parties did not directly present appellee's conduct in such terms, the arguments here and below centered on the effects of his misconduct and clearly implicate that doctrine.

**11.** [T]he principle was established from the earliest days, that while the court of chancery could interpose and compel a defendant to comply with the dictates of conscience and good faith with regard to matters outside of the strict rules of the law, or even in contradiction to those rules, while it could act *upon the conscience* of a defendant and force him to do right and justice, it would never thus interfere on behalf of a plaintiff whose own conduct in connection with the same matter or transaction had been unconscientious or unjust, or marked by a want of good faith, or had violated any of the principles of equity and righteous dealing which it is the purpose of the jurisdiction to sustain. While a court of equity endeavors to promote and enforce justice, good faith, uprightness, fairness, and conscientiousness on the part of the parties who

■ Thus, the clean hands doctrine does not bar relief to a party merely because his conduct in general has been shown not to be blameless; the doctrine only applies where the wrongdoing directly affects the relationship subsisting between the parties and is directly connected with the matter in controversy. *Stauffer v. Stauffer*, 465 Pa. 558, 351 A.2d 236 (1976) (opinion by Eagen, J.); *Spring City Foundry Co. v. Carey*, 434 Pa. 193, 252 A.2d 666 (1969); *Shapiro v. Shapiro*, 415 Pa. 503, 204 A.2d 266 (1964); *McLaughlin v. McLaughlin*, 410 Pa. 1, 187 A.2d 905 (1963). It does not apply to collateral matters not directly affecting the equitable relations which exist between the parties. *Shapiro v. Shapiro*, 415 Pa. at 507, 204 A.2d at 268, *McLaughlin v. McLaughlin*, 410 Pa. at 5, 187 A.2d at 907.

■ In the instant case, the Orphans' Court was plainly right in finding the conduct of appellee in drafting the Pedrick will unconscionable. Putting aside any violation of Ethical Consideration 5–5 of the Code of Professional Responsibility,[12] appellee Butler's conduct in dealing with the

occupy a defensive position in judicial controversies, it no less stringently demands the same from the litigant parties who come before it as plaintiffs or actors in such controversies. This fundamental principle is expressed in the maxim, He who comes into a court of equity must come with clean hands; and although not the source of any distinctive doctrines, it furnishes a most important and even universal rule affecting the entire administration of equity jurisprudence as a system of remedies and remedial rights.
2 Pomeroy's Equity Jurisprudence § 398, at 739–740 (Fourth Ed.1918) (footnotes omitted) (emphasis in original).

12. Under these circumstances, such conduct appears to go beyond a mere appearance of impropriety and constitutes actual impropriety. This Court is particularly shocked by Mr. Butler's admissions regarding his efforts to have Mr. Pedrick cremated. Appellee testified:
After the will had been prepared I asked Joe if he would—if he ever—if he had ever considered the matter of cremation. He said no, sir, that is against the rules of the Catholic Church. I said Joe, if I told you that it is not the rules of the Catholic Church, would you have any objection to it. And he looked at me and he said are you sure it is not against the rules. I said I am positive it is not against the rules of the church, Joe. He questioned me quite extensively on this, and then he said well, he said are you are sure of this, and he questioned me two or three times about it again. I said yes, there is no objection to cremation in the Catholic Church. I said it [sic]

testator in private and thus through his own conduct insuring against appellant's ever knowing what actually took place between appellee and Mr. Pedrick, precludes him from using a court applying equitable principles to obtain the benefit of that conduct. His unconscionable conduct surrounding the September 27, 1979 matter is directly related to the matter at issue and directly affects the equitable relations between the parties. Having concluded that appellee's conduct not only violated Ethical Consideration 5–5 but was otherwise "inexcusable," the Orphans' Court abused its discretion when it failed to bar Mr. Butler from relief in equity under the "clean hands" doctrine.[13] We base our holding not on Mr. Butler's violation of an Ethical Consideration of the Code of Professional Responsibility; rather, we find that Mr. Butler's conduct in this matter, when viewed on the whole record, shocks the conscience of this Court.[14]

> used to be some objection to it, but that has been removed. He said as long as you promise me that you will check and make sure that there is no objection to it, it's all right by me.
> N.T. 179–80. Appellee said he did not change the will at that point, "[b]ecause it was quite late and I had already written the will out once, and after that point I didn't pursue it any further." N.T. 180. However, he admitted that he called the funeral director and told him "as far as I know, I am named as the executor and there has been verbal instructions about cremation." N.T. 181. The hearing judge then sustained an objection on relevancy grounds to a question as to whether Mr. Butler remembered stating to Mr. Gregory he would not pay for a ground funeral. Appellee's conduct at the hospital with respect to the funeral arrangements certainly supports a finding of undue influence. Coupled with his conduct in drafting this will without witnesses, it shocks the conscience of this Court.

13. The doctrine of undue influence, which was expressly raised by contestant John Gregory, is a particular type of constructive fraud. It is an equitable remedy which may be pleaded in all cases where there is no coercion amounting to duress, but where a transaction is the result of a moral, social, or domestic force exerted upon a party controlling the free action of his will and preventing any true consent. See 2 Pomeroy's Equity Jurisprudence (Fourth Ed.) § 951, at 2023–26.

14. It is apparent from a review of this record that the Orphans' Court en banc was disturbed by this conduct but was influenced in its result by George Butler, Sr.'s excellent reputation as well as by the fact that "over the years" Mr. Butler had earned "the confidence of this Court." While Mr. Butler's reputation would be relevant in any disciplinary

Reversed and remanded to the Orphans' Court for proceedings consistent with this opinion.[15]

NIX, C.J., files a concurring opinion, in which LARSEN, J., joins.

ZAPPALA, J., files a dissenting opinion in which McDERMOTT, J., joins.

NIX, Chief Justice, concurring.

I accept the majority's judgment that the conduct of the attorney-scrivener-beneficiary, Mr. Butler, shocks the conscience of the court and justifies a denial of the relief he seeks under the equitable doctrine of clean hands.[1] I am also in agreement that the fact the conduct may have transgressed Ethical Considerations (EC) 5–5 and 5–6 of the Code of Professional Responsibility is not of critical significance to this result.[2] It is the nature of the conduct itself and its effect upon the transaction which requires the remedy afforded. I therefore join the mandate of the majority reversing the Orphans' Court and remanding for the probate of the earlier will in favor of John Gregory, appellant.

My agreement with the majority's application of the doctrine of clean hands does not alter my view that the instant facts would also sustain a claim of undue influence. Nor am I unmindful of the limitation, in responding to

proceeding arising from the drafting of this will, it cannot stand as an acceptable excuse for unconscionable conduct in a court governed by equitable principles.

**15.** The Prothonotary is directed to furnish a certified copy of this Opinion to the Disciplinary Board for further proceedings as may be appropriate.

**1.** The proponent of a will cannot seek the aid of a court of equity to secure the probate of a will, the execution of which was effectuated by his own wrongdoing. *See Cross' Estate,* 319 Pa. 1, 179 A. 38 (1935); *Hays' Estate,* 159 Pa. 381, 28 A. 158 (1893).

**2.** It is difficult to conceive of a situation where the conduct found to justify the bar under this doctrine, where it relates to the activities of an attorney in the performance of his or her professional responsibilities, would not also amount to an ethical violation.

conduct of this kind, of the theory employed by the majority to decide this case. That doctrine would not have been a defense to the admission to probate of the will if someone other than the appellee had been the proponent or the executor. The doctrine of clean hands applies only where the plaintiff's wrongdoing directly affects the equitable relations existing between the parties. *Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 430 Pa. 550, 244 A.2d 10 (1968); *Holst v. Butler*, 379 Pa. 124, 108 A.2d 740 (1954); *Goldberg v. Goldberg*, 375 Pa. 78, 99 A.2d 474 (1953); *Bennet v. Lane Homes, Inc.*, 369 Pa. 509, 87 A.2d 273 (1952); *Dales v. Muir*, 351 Pa. 187, 40 A.2d 476 (1945); *Hartman v. Cohn*, 350 Pa. 41, 38 A.2d 22 (1944); *Robinson v. Goldberg*, 331 Pa. 401, 200 A. 4 (1938).

Upon careful review of the entire record, I must disagree with the majority's rejection of appellant's contention that the evidence of weakened intellect and the conduct of appellee shifted the burden to appellee to disprove the allegation of undue influence. Under settled interpretation of existing law, a presumption of undue influence was raised, thereby shifting the burden to appellee to establish by clear and convincing evidence that the will represented the testator's unfettered intention for the disposition of his estate. That burden clearly was not met on this record.

Undue influence has been described by this Court as follows:

"The word 'influence' does not refer to any and every line of conduct capable of disposing in one's favor a fully and self directing mind, but to control acquired over another that virtually destroys his free agency.... In order to constitute undue influence sufficient to void a will, there must be imprisonment of the body or mind ... fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery or physical or moral coercion, to such a degree as to prejudice the mind of the testator, to destroy his free agency and to operate as a present restraint upon him in the making of a will." *Williams v. McCarroll, supra*, 374 Pa. at 295–296, 97 A.2d at 20

*quoting from Phillips Estate,* 244 Pa. 35, 43, 90 A. 457, 460 (1914).

*Estate of Ziel,* 467 Pa. 531, 541, 359 A.2d 728, 733 (1976).

It is beyond cavil that a contestant can raise a presumption of undue influence and thereby shift the burden of production of evidence to the proponent by establishing by clear and convincing evidence that, at the time of execution of the will, the testator was of weakened intellect, and that a person in a confidential relationship with the testator received a substantial benefit under the will. *Estate of Reichel,* 484 Pa. 610, 400 A.2d 1268 (1979); *Estate of Ziel, supra; Estate of Fickert,* 461 Pa. 653, 337 A.2d 592 (1975); *Estate of Clark,* 461 Pa. 52, 334 A.2d 628 (1975); *Estate of Button,* 459 Pa. 234, 328 A.2d 480 (1974).

This Court has stated that a confidential relationship exists

"when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both situations an unfair advantage is possible." *Leedom v. Palmer,* 274 Pa. 22, 25, 117 A. 410, 411 (1922). See also *McClatchy Estate,* 433 Pa. 232, 249 A.2d 320 (1969). "A confidential relationship is created between two persons when it is established that one occupies a superior position over the other—intellectually, physically, governmentally, or morally—with the opportunity to use that superiority to the other's disadvantage." *Union Trust Company of New Castle v. Cwynar,* 388 Pa. 644, 653, 131 A.2d 133, 137 (1957).

*Estate of Thomas,* 463 Pa. 284, 289–290, 344 A.2d 834, 836 (1975).

*Drob v. Jaffe,* 351 Pa. 297, 41 A.2d 407 (1945), the late Chief Justice, then Mr. Justice Stern stated that "a confidential relationship is not limited to any particular association of parties but exists wherever one occupies toward another such a position of advisor or counsellor as reasonable to inspire confidence that he will act in good faith for the

other's interest ...." *Id.*, 351 Pa. at 300, 41 A.2d at 408; *accord, Frowen v. Blank,* 493 Pa. 137, 425 A.2d 412 (1981); *Shook v. Bergstrasser,* 356 Pa. 167, 51 A.2d 681 (1947); *Hamberg v. Barsky,* 355 Pa. 462, 50 A.2d 345 (1947). A confidential relationship can be presumed as a matter of law between the testator and attorney-scrivener. *Estate of Thomas, supra; Leedom v. Palmer,* 274 Pa. 22, 117 A. 410 (1922); Restatement (Second) of Trusts § 44, comment (c) (1959).

This record not only establishes, as a matter of law, the confidential relationship, but also that the testator was of weakened mind prior to the execution of this will. Dr. De, the decedent's treating cardiologist, testified before the hearing court that, as a result of organic brain syndrome and arteriosclerosis, the patient exhibited forgetfulness, disorientation and depression. Further, Dr. Connor, the decedent's treating physician of over twenty years, testified that he treated the decedent for congestive heart failure, arteriosclerosis, pleural effusion of the lung, cardiomegaly, and cerebral metastatic carcinoma, among other ailments. Dr. Connor testified that the decedent was "not capable of physically or mentally taking care of himself", that he was "decrepit and feeble", and that his physical abilities were impaired. Indeed, in the summer of 1979, Dr. Connor testified that the decedent visited his office wearing clothes covered with urine and excrement. Dr. Connor further testified that Mr. Pedrick would often be conversing coherently only to go off on a tangent, that he had a poor ability for prolonged concentration and that he was unaware of his assets. The inescapable conclusion is that the contestant to the will clearly and convincingly sustained his burden of establishing that the decedent was physically and mentally weak and that a confidential relationship existed between the testator and Mr. Butler so as to properly raise a presumption of undue influence. *Estate of Reichel, supra.*

The burden therefore shifted to the proponent, Mr. Butler, to clearly and convincingly [3] establish that the "bequest was the free, voluntary and clearly understood act of the other party and that the entire transaction ... was unaffected by undue influence or imposition or deception or fraud." *Estate of Button, supra,* 459 Pa. at 240, 328 A.2d at 483; *Williams v. McCarroll,* 374 Pa. 281, 295, 97 A.2d 14, 21 (1953).

Although the majority concludes that our scope of review is limited by the factual findings of the Orphans' Court, we are not bound by the determinations of that court where its findings lacked evidentiary support or where the court capriciously disregarded competent evidence, *Lanning Will,* 414 Pa. 313, 200 A.2d 392 (1964); *Masciantonio Will,* 392 Pa. 362, 367, 141 A.2d 362 (1958); *Pusey's Estate,* 321 Pa. 248, 184 A. 844 (1936). The Orphans' Court determination that the proponent satisfied his burden of proving the absence of undue influence by clear and convincing evidence cannot be successfully defended on this record.

The Orphans' Court relied upon the appellee's testimony in finding that the burden had been met. That testimony standing alone is insufficient, as a matter of law, to satisfy the appellee's significant burden of rebutting the presumption of undue influence.

The Orphans' Court inferred from the testator's previous wills that he had an unfettered intention to confer a benefit on the Butlers. This inference was drawn in the face of evidence establishing the revocation of the prior will follow-

3. The test of clear and convincing evidence has been articulated as follows:

> [T]he witnesses must be found to be credible, ... the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and ... their testimony is so clear, direct, weighty, and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue ... It is not necessary that the evidence be uncontradicted ..., provided it 'carries a clear conviction to the mind' ... or carries 'a clear conviction of its truth ...'

*LaRocca Trust,* 411 Pa. 633, 640, 192 A.2d 409, 413 (1963).

*Accord, Thomas v. Seaman,* 451 Pa. 347, 351, 304 A.2d 134, 137 (1973); *Broida v. Travelers Insurance Co.,* 316 Pa. 444, 448, 175 A. 492, 494 (1934).

ing a disagreement between Mr. Butler and the testator. It is also to be noted Mr. Butler testified that the testator did not know his brother although the brother was given one-half of the estate at Mr. Butler's suggestion. By appellee's own testimony, his relationship with the testator was such that he was able to influence the decedent to give one-half of his estate to someone unknown to him.

The fact that Mr. Butler procured the execution of this will in the complete absence of any impartial witnesses and/or without the participation of a disinterested attorney weighs heavily against him. *Estate of Clark, supra,* 461 Pa. at 66, 334 A.2d at 635; *Blume v. Hartman,* 115 Pa. 32, 40, 8 A. 219, 222 (1887). The appellee created a situation where these events were cloistered from the observation of potential witnesses who may have been available to offer unbiased evidence.

This conclusion is further buttressed by his conduct when he returned to the testator's bedside two days later, only to have himself named as beneficiary on the testator's federal pension. There is absolutely no reason on the subsequent visit that an impartial third party could not have been present to witness that meeting. The proponent-appellee's uncorroborated and self-serving testimony clearly does not provide evidence of sufficient probative value, as a matter of law, to rebut the presumption of undue influence that was raised in this case.

I therefore concur with the majority's decision to remand to the Orphans' Court for the probate of the earlier will in favor of John Gregory, appellant.

LARSEN, J., joins in this concurring opinion.

ZAPPALA, Justice, dissenting.

The majority finds that the equitable doctrine of unclean hands compels its reversal of the Superior Court's affirmance of the lower court's order admitting the September 27, 1979 writing as the decedent's will. The majority concedes that the lower courts did not commit reversible error in

determining that undue influence had not been established by the contestant to the will, but interjects its equity analysis to justify its conclusion. The foundation for its holding is that the Appellee's conduct interfered with the court's "... determination based on untainted disinterested evidence, as to whether this testator freely willed his worldly goods to Appellee and Appellee's brother." [Majority op. at 535]. The conduct of the Appellee to which the majority refers is:

> "Appellee's failure to secure any witness to what transpired between him and the testator, despite the second opportunity created when he came back two days later to effect a beneficiary change in his own favor, effectively insulated the will he prepared to his own benefit from any acceptable inquiry into the very issue before the court, undue influence." [Majority op. at 535].

The majority opinion unduly emphasizes the Appellee's failure to have the decedent re-execute the will in the presence of disinterested subscribing witnesses. The error in this reasoning is that it disregards the function of a subscribing witness to testify to the authenticity of the testator's signature.[1] The presence of subscribing witnesses would not eliminate the need for a court's determination of undue influence, nor would it resolve the issue. Even if witnesses had been secured, inquiry into the presence of undue influence would not have been foreclosed.

Typically, the witnesses are unaware of the contents of the document. Subscribing witnesses would rarely be privy to discussions between an attorney and client related to the dispositive provisions of a will. Nor would witnesses necessarily be aware of whatever pressures may have been brought to bear on a testator's scheme. This is the common experience whether or not the beneficiary is the attorney.

1. The decedent's death occurred prior to the effective date of 20 Pa.C.S. § 3132.1 [relating to self-proved wills]; however, my analysis would not be affected by this provision as a witness' affidavit made pursuant thereto will be accepted by the register as proof of the facts stated "[u]nless there is a contest with respect to the validity of the will."

Since procuring witnesses would not have prevented the contestant to the will from challenging the validity of its provisions by claiming undue influence, his failure to do so may not reasonably be interpreted as conduct barring the attorney from receiving property which has been devised to him. The majority ignores the very nature of the attorney-client relationship. The practical, but unintended, effect of the majority's opinion is that the Appellant is permitted to accomplish through a circuitous route what the Court expressly disdains—enforcing the Code of Professional Responsibility by affecting the substantive rights of an attorney-beneficiary during litigation of the contestant's claim.

It is inconceivable to me that a contestant should be permitted to successfully raise a claim of undue influence without having to establish the claim at trial. And, yet, that is the outcome of the holding in the majority's opinion. The majority accepts the hearing court's finding, supported by the record, that the will was not procured by the exercise of undue influence, but permits the contestant to prevail. If, as the majority finds, the Appellee's conduct inhibited inquiry into the issue of undue influence, so too has the majority prevented such inquiry by creating a rule which would prevent a hearing court from making an independent finding based on evidence presented. The majority recognizes that the Appellee had the burden of going forward with evidence to demonstrate that there was no undue influence. The effect of the majority's reasoning, however, is that the attorney-beneficiary is put out of court because of "unclean hands" without the opportunity to meet his burden.

I agree with the majority that the Code of Professional Responsibility does not have the force of substantive law. Until such time as the substantive law relating to an attorney-beneficiary has been altered by statute or rule, it should not be legislated by this Court in individual cases under the guise of equity.

McDERMOTT, J., joins in this dissenting opinion.