J. A29015/16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF DOROTHY A. CARRATURA, RALPH S. CARRATURA, EXECUTOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| V. | : : : | |
| MICHELE D. MYERS AND JOHN MYERS, | : : | |
| Appellants | : : | No. 294 WDA 2016 |

Appeal from the Order January 28, 2016
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): OC No 02-10--02113

BEFORE: DUBOW, J., MOULTON, J., and MUSMANNO, J.

MEMORANDUM BY DUBOW, J.:                    **FILED JANUARY 9, 2017**

Appellants, Michele D. Myers and John Myers, appeal from the January 28, 2016 Order entered in the Court of Common Pleas of Allegheny County Orphans' Court. The Order denied Appellant's Exceptions to the trial court's October 19, 2015 and October 22, 2015 Orders which ordered Appellants to return certain funds to decedent Dorothy A. Carratura's estate, and enjoined certain assets held by Appellants. After careful review, we vacate the trial court's Order on the basis that (i) the trial court erred in admitting the testimony of the estate's medical expert because the expert could only opine that decedent "most probably" suffered from a weakened intellect; and (ii) the trial court abused its discretion, in part, when it included in its unclean

hands analysis Appellant Michele's failure to timely notify her brothers of their parents' deaths. Because we vacate and remand to the trial court for further proceedings, we decline to address Appellants' remaining issues.

The trial court summarized the procedural history and findings of fact in the record below as follows:

> On June 2, 2011, Ralph S. Carratura, as the Executor of the Estate of Dorothy A. Carratura filed a Petition for Issuance of a Citation to Michele D. Myers and John Myers to Show Cause Why they Should Not File an Accounting of their Actions as Agent under the Decedent's Power of Attorney. The Citation was issued and Michele D. Myers filed an Account in a timely fashion. On July 18, 2014, the Executor filed a Petition for Issuance of a Citation to Michele D. Myers. and John Myers to Show Cause Why they Should Not be Compelled to Repay $480,000 in Annuity Funds. The Citation was issued. After the parties conducted discovery, a hearing was held before the Court on June 9-11, 2015 and July 6, 2015.

> ### Findings of Fact

> 1. Sam and Dorothy Carratura were the parents of three children, Ralph and Robert (who are twins) and Michele (now, Michele Myers, who is married to John Myers).

> 2. Sam Carratura died on August 29, 2009. Michele Myers did not notify her brothers when he died. An aunt called Robert a few days after he died and informed him of the death; he then called Ralph to inform him.

> 3. Dorothy Carratura, the Decedent herein, died testate on March 5, 2010. Again, Michele Myers did not notify her brothers when she died. As with their father, the brothers were informed of the death after she was buried via a telephone call from an aunt.

> 4. On June 17, 2007, the Decedent executed her Last Will and Testament, which divides her estate equally between her three children.

5. Michele and John Myers, along with their two children, resided in a residence bordering the residence of Michele's parents. The Myers family had a very close relationship with Michele's parents.

6. Ralph and Robert had a good relationship with their parents, although they did not live as close to them as the Myers family.

7. The Decedent and Sam moved into an apartment in Michele and John's house in the fall of 2007 because the Decedent needed assistance caring for Sam, whose health was failing. The Decedent was not happy about moving into Michele and John's house.

8. Robert and Ralph attended a lunch at Applebee's with the Decedent in March 2008. She appeared to be rather confused and she had difficulty selecting a menu item.

9. Sam was moved to Sunrise Assisted Living residence in late July or early August 2008.

10. In August or September of 2008, Ralph took the Decedent out for dinner at Eat'n Park. Again, the Decedent was confused and she had difficulty ordering for herself. The Decedent lost control of her bladder while sitting at the table.

11. On June 25, 2007, the beneficiary on the Decedent's Annuity No. [Redacted] was changed to designate Michele Myers as the sole beneficiary. Michele Myers received the proceeds in the amount of $39,394.81 after the Decedent's death, although she has denied receiving the proceeds or has claimed, on some occasions, that she does not remember receiving the proceeds.

12. On November 19, 2008, an annuity was purchased through Jackson National Life with the assistance of Christopher Marsico, a financial advisor, in the amount of $480,000. The annuity was funded with three separate checks as follows: (a) a check in the amount of $150,000 from a joint account in the names of the Decedent and her husband; (b) a check in the amount of $200,000 from a joint account in the names of the Decedent and Michele Myers; and (c) a check in the amount of $130,000 from a joint account in the names of John and Michele Myers.

13. Even though Sam Carratura was still living, the sole beneficiary of the annuity, per the application, was Michele Myers.

14. A written Request for Partial Withdrawal of the annuity was sent to Jackson National Life on or about February 11, 2010. Pursuant to that request, a check in the amount of $76,937.26 was issued in the name of the Decedent.

15. The check was not cashed. Rather, on the morning of March 5, 2010, John Myers contacted Mr. Marsico and indicated that the Decedent was in ailing health and no longer needed the money and he wanted to have the check reinvested in the annuity "for the estate." Mr. Myers then inquired about "the beneficiary process" with regard to the annuity. Mr. Marsico explained that if the beneficiary was a person other than the estate, the funds would be distributed to the named beneficiary. Mr. Myers delivered the original check to Mr. Marsico's office on the afternoon of March 5, 2010. [Decedent died that same day.] As Mr. Marsico had already left the office, he overnight mailed the check to Jackson National Life on the following Monday, March 8, 2010.

16. Michele Myers, as the named beneficiary of the annuity, filed a claim and received the cash surrender value of $521,166.31.

17. Lisa Morrow, Ph.D., an expert called by the Executor, opined that the Decedent "most probably" was in a state of weakened mental intellect in November 2008.

18. J. Wright Leonard, who is a forensic document examiner and a handwriting expert, testified that of the fifteen (15) questioned signatures that he was asked to compare with the known signatures of the Decedent, samples 1 through 6 and 15 were the Decedent's signatures and samples 7 through 14 were not the Decedent's signatures.

19. Virginia Balderston, M.D. was the Decedent's treating physician. She testified via deposition that the Decedent was competent to make legal and financial decisions in 2007 and 2008 and that she did not have a weakened intellect during that time period. She further stated that the Decedent had memory loss as of her appointment on December 17, 2007, but she was not exhibiting signs of dementia. By the spring and summer of 2009, the Decedent's health was declining, she had increased

memory deficits, she only knew herself, and she did not know the date, the day of the week, or where she was.

Trial Court Opinion, filed 10/19/15, at 2-5 (unpaginated).

Based on those findings, the trial court entered its October 19, 2015 Order finding "that the Decedent was under the undue influence of John and Michele Myers when she purchased the $480,000 annuity from Jackson National Life." *Id.* at 6. In its Opinion, the trial court stated that it found "two . . . areas of testimony to be of particular importance in showing that John and Michele Myers did not come into court 'with clean hands.'" *Id.* at 7. It then discussed their failure to notify Michele's brothers about the deaths of their parents, and John's phone call to the financial advisor the day of Decedent's death, and how each action or omission "demonstrates bad faith" on the part of Appellants. *Id.* at 7-8.

On October 20, 2015, Appellee filed an Emergency Motion to Enjoin [Appellants'] Disposition of Assets, which the trial court granted in part in an Order filed October 22, 2015.

On November 4, 2015, Appellants filed Exceptions to both Orders, which the trial court denied in an Order filed February 1, 2016.

Appellants timely appealed. Appellants complied with Pa.R.A.P. 1925, however, the trial court did not prepare a Pa.R.A.P. 1925(a) Opinion

responsive to Appellants' Concise Statement of Errors Complained of on Appeal.[1]

On appeal, Appellants raise the following six issues:

1. The trial court committed an error of law and abused its discretion when it denied [Appellants'] *motion in limine* to strike a portion of the estate's medical expert's testimony and allowed that medical expert to offer an opinion at trial that the Decedent was "most probably" suffering from a weakened intellect when she purchased the annuity in November 2008.

2. The trial court abused its discretion by permitting the estate to present irrelevant and immaterial testimony at trial relating to events that occurred long after Decedent's November 2008 annuity purchase, by giving excessive and undue weight to that testimony and by imposing its own unclean hands standard on [Appellants] in evaluating whether they engaged in undue influence over Decedent in connection with that annuity purchase.

3. The record does not contain sufficient, clear and convincing evidence to support the trial court's finding that Decedent's annuity purchase in November 2008 resulted from the undue influence of [Appellants].

4. The trial court committed an error of law or abused its discretion when it denied John Myers' Motion for Summary Judgment and then failed to enter judgment in his favor following the trial, since John Myers did not receive a substantial benefit from Decedent's annuity purchase.

5. Even assuming the court affirms the trial court's finding that Decedent's annuity purchase resulted from the undue influence of [Appellants], the trial court committed an error or law or abused its discretion when it ordered Michele Myers to deposit all of the annuity proceeds into the estate, including monies that were not or would never have become part of the estate and when it arbitrarily added pre-judgment interest.

---

[1] In lieu of a Pa.R.A.P. 1925(a) Opinion, the trial court directed this Court to its October 19, 2015 Order. That Order only addresses one of the six issues that Appellants raised.

6. The trial court committed an error of law or abused its discretion when it issued the order dated October 21, 2015, without requiring the estate to satisfy its legal burden that it was entitled to injunctive relief and when it improperly enjoined and froze the assets of [Appellants] that were unrelated to the annuity proceeds.

Appellants' Brief at ii-iii (reordered for ease of disposition).

In Pennsylvania, a presumption of undue influence arises when the person claiming undue influence establishes, by clear and convincing evidence, that "(1) a person or persons in a confidential relationship with a testator or grantor has (2) received a substantial portion of the grantor's property, and (3) that the grantor suffers from a weakened intellect." *Owens v. Mazzei*, 847 A.2d 700, 706 (Pa. Super. 2004) (citations omitted).

In their first issue, Appellants aver that the trial court erred in admitting the testimony of the estate's medical expert, Dr. Morrow, to satisfy the weakened intellect prong of undue influence, because Dr. Morrow could only testify that Decedent "most probably" suffered from a weakened intellect when she purchased the annuity.

In Pennsylvania, the law is well settled that, "[t]o be admissible, the opinion of an expert witness must be rendered within a reasonable degree of medical certainty." *Montgomery v. South Philadelphia Medical Group, Inc.*, 656 A.2d 1385, 1390 (Pa. Super. 1995) (citation omitted). An expert's opinion need not be excluded simply because he used less definitive language, so long as "at some time during his testimony he expressed his opinion with reasonable certainty." *Id.* Therefore, courts are instructed to

consider an expert's testimony "in its entirety" before determining whether the requisite degree of certainty has been met. ***Id.***

Moreover, the expert must have a reasonable degree of certainty that the subject of his opining **is** or **is not** true. It is not enough to say that one is reasonably certain that something **might** be true. ***Id.*** ("An expert must testify with 'reasonable certainty' that in his professional opinion, the result in question **did** come from the cause alleged. An expert fails this standard of certainty if he testifies that the alleged cause 'possibly,' or 'could have' led to the result, that it 'could very properly account' for the result, or even that it was 'very highly probable' that it caused the result." (citations and some quotations omitted, emphasis added)).

As this Court has recognized:

> [t]he issue is not merely one of semantics. There is a logical reason for the rule. The opinion of an expert is evidence. If the fact finder chooses to believe it, he can find as fact what the expert gave as an opinion. For a fact finder to award damages for a particular condition to a plaintiff it must find as a fact that the condition was legally caused by the defendant's conduct. It is the intent of our law that if the plaintiff's expert cannot form an opinion with sufficient certainty so as to make a professional judgment, there is nothing on the record with which a factfinder can make a decision with sufficient certainty so as to make a legal judgment.

***Cohen v. Albert Einstein Medical Center***, 592 A.2d 720, 723 (Pa. Super. 1991) (citation and quotation omitted).

In the instant case, Dr. Morrow did make passing reference to phrases like "reasonable degree of neuropsychological certainty" and "most probable

degree of reasonable certainty." Report of Dr. Morrow, at 3 (unpaginated); N.T., 6/10/15, at 335. However, Dr. Morrow did not state, in either her expert report or her trial testimony, that Decedent actually suffered from a weakened intellect. At best, Dr. Morrow testified that she was reasonably certain that Decedent "most probably" suffered from a weakened intellect when she purchased the annuity. ***Id.***

This degree of certainty is insufficient to satisfy the requirements of ***Montgomery, supra***, and ***Cohen, supra***. Appellee had the burden of establishing, by clear and convincing evidence, that Decedent did in fact suffer from a weakened intellect. Dr. Morrow's opinion that she "probably" did cannot form the basis for a finding that she **did** so suffer. Therefore, we agree with Appellants that the trial court erred in admitting the testimony of Dr. Morrow.

Moreover, given that the Appellee's evidence of Decedent's weakened intellect consisted primarily of lay testimony about two lunch dates and an inadmissible expert opinion, we do not find that the trial court's error was harmless. We, therefore, vacate and remand for the trial court to reconsider the evidence without Dr. Morrow's testimony.

Given that we are constrained to vacate, we need not address the majority of Appellants' remaining issues. However, we would be remiss in not addressing their second allegation of error, in which they aver that the

trial court, *inter alia*, abused its discretion in applying the doctrine of unclean hands to Appellants.

Our Supreme Court discussed the doctrine of unclean hands, and its application to the Orphans' Court as a court of equity, in ***In re Estate of Pedrick***, 482 A.2d 215, 222 (Pa. 1984). There, the Court noted that the doctrine of unclean hands "is derived from the unwillingness of a court to give relief to a suitor who has so conducted himself as to shock the moral sensibilities of the judge, and it has nothing to do with the rights or liabilities of the parties." ***Id.*** The doctrine's applicability is limited, however, and "does not bar relief to a party merely because his conduct in general has been shown not to be blameless; the doctrine only applies where the wrongdoing directly affects the relationship subsisting between the parties and is directly connected with the matter in controversy." ***Id.***

A trial court has discretion to raise and apply the doctrine *sua sponte*, and we review its decision to do so for an abuse of discretion. ***Stauffer v. Stauffer***, 351 A.2d 236, 245 (Pa. 1976).

In the instant case, the trial court focused on two "areas of testimony" to support its finding that Appellants "did not come into court 'with clean hands.'" Trial Court Opinion at 7. We find the trial court abused its discretion with regard to one, and, thus, we address each "area" separately.

The trial court first focused on Appellant Michele's failure to notify her brothers after the passing of their father and Decedent. The trial court

found it "simply unfathomable that she would not call her brothers to inform them or, at the very least, ask her husband or one of her children to do so. This conduct demonstrates bad faith on [Appellant] Michele's part and leads the [trial court] to question her motives with regard to the Decedent's estate." *Id.*

We disagree. While the delay was perhaps distressing to Decedent's sons, and arguably not blameless, Appellant Michele's failure to notify her brothers is not "directly connected" to the purchase of the 2008 annuity such that it would permit Appellee to prevail regardless of the rights or liabilities of the parties. *Estate of Pedrick, supra* at 222. Therefore, we conclude that the trial court abused its discretion in applying the doctrine of unclean hands based on these facts.

The trial court also focused on Appellant John's behavior of re-depositing $76,937.26 into the annuity on the date of Decedent's death. There, the evidence showed that he "contacted the financial advisor on the morning of the Decedent's death for the purchase (*sic*) of re-depositing the partial annuity withdrawal, which increased the value of the annuity and decreased the value of the Decedent's estate[.]" Trial Court Opinion at 8. After reviewing the record, we conclude that the trial court did not abuse its discretion insofar as it considered Appellants' claim to the $76,937.26 Appellants re-deposited on the eve of Decedent's death.

In light of the foregoing, we vacate the trial court's January 28, 2016 Order denying Appellants' Exceptions. On remand, the trial court is instructed to consider the merits of Appellee's undue influence claim without Dr. Morrow's testimony and without a finding of unclean hands due to Appellant Michele's failure to contact her brothers. If the trial court finds undue influence on remand, the trial court should address Appellants' remaining claims, including whether Appellant John benefitted from the estate. Moreover, the record is clear that Appellants provided, at a minimum, $130,000 of the purchase cost of the annuity from their own personal funds. If the trial court determines that Appellants must pay the full value of the annuity to the estate, the court is instructed to provide its reasoning for not giving credit to Appellants for the amount they contributed.

Order vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/9/2017